# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47251-1-II |
| Respondent, | |
| v. | |
| BRIAN M. BASSETT, | PART PUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — In 1996, a jury found Brian M. Bassett guilty of three counts of aggravated first degree murder committed when he was 16 years old. The trial court imposed three "life without parole" sentences. In 2015, after a *Miller*[1] hearing, the resentencing court again imposed three life without parole sentences. Bassett appeals his new sentence and successfully argues that a provision of the *Miller*-fix statute, RCW 10.95.030(3)(a)(ii),[2] violates our State's constitutional prohibition against cruel punishment. In the published portion of this opinion, we waive procedural defects and treat Bassett's claim as a personal restraint petition (PRP). We hold

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[2] In 2014, the legislature enacted RCW 10.95.035(1), requiring that persons sentenced "prior to June 1, 2014 . . . to a term of life without the possibility of parole for an offense committed prior to their eighteenth birthday, shall be returned to the sentencing court . . . for sentencing consistent with RCW 10.95.030." LAWS OF 2014, ch. 130, § 11. Thus, we cite to the current version of RCW 10.95.030 unless otherwise noted.

that under a categorical bar analysis, the statutory *Miller*-fix provision that allows 16- to 18-year-old offenders convicted of aggravated first degree murder to be sentenced to life without parole or early release violates article I, section 14 of the state constitution prohibiting cruel punishment. In the unpublished portion, we reject Bassett's remaining arguments. Because Bassett shows that grounds exist to challenge the legality of his restraint, we reverse Bassett's sentence and remand for resentencing in accordance with this opinion.

FACTS

I. BACKGROUND FACTS AND PROCEDURE

In 1995, 16-year-old Bassett, who had been "'kicked out'" of his home by his parents, Wendy and Michael Bassett,[3] stole a rifle and placed a soda bottle over the gun barrel as a "'silencer.'" *State v. McDonald*, 138 Wn.2d 680, 683, 981 P.2d 443 (1999); *State v. Bassett*, noted at 94 Wn. App. 1017, 1999 WL 100872, at *3.[4] Several days later, Bassett broke into his parents' home and shot them multiple times. *Bassett*, 1999 WL 100872, at *1. Meanwhile, 17-year-old Nicholaus McDonald disabled the Bassetts' phone line so that they could not call for help and waited outside. *Bassett*, 1999 WL 100872, at *1; *McDonald*, 138 Wn.2d at 683. McDonald then entered the home and shot Michael, who was still breathing after Basset had shot him, in the head. *McDonald*, 138 Wn.2d at 684. Basset's five-year-old brother, Austin Bassett, witnessed the shootings; Bassett or McDonald then drowned Austin in a bathtub. *McDonald*, 138 Wn.2d at 683-

---

[3] We use the first names of Bassett's parents and brother to avoid confusion, and we intend no disrespect.

[4] Where appropriate, we rely upon the facts from *McDonald*, 138 Wn.2d at 683-85, and our unpublished opinion affirming Bassett's convictions after he appealed several evidentiary rulings. *Bassett*, noted at 94 Wn. App. 1017.

84.[5] McDonald hid Austin's and Michael's bodies away from the home. *McDonald*, 138 Wn.2d at 684. McDonald and Bassett hid Wendy's body in the Bassetts' pump house, and McDonald cleaned the home. *McDonald*, 138 Wn.2d at 684-85.

McDonald turned himself in to the police the next day and implicated himself and Bassett in the killings. *McDonald*, 138 Wn.2d at 683; *Bassett*, 1999 WL 100872, at *1. The State charged Bassett with three counts of aggravated first degree murder. At trial, the State introduced Bassett's statement to the police that he and McDonald had tried to kill Bassett's parents twice before the crimes, but their attempts were foiled. *Bassett*, 1999 WL 100872, at *1. A jury convicted Bassett of three counts of aggravated first degree murder, and the trial court sentenced Bassett to three consecutive terms of life without the possibility of parole. Former RCW 10.95.030(1) (1993).

II. RESENTENCING MITIGATION EVIDENCE AND HEARING

In 2015, Bassett, who was then 35 years old, appeared for resentencing under RCW 10.95.030(3) (the *Miller*-fix statute) and .035(1).[6] Bassett argued that the *Miller*-fix statute was unconstitutional under *Miller* and requested that he be resentenced to three 25-year concurrent sentences for each crime and allowed earned early release credit. In support of these arguments,

---

[5] McDonald initially confessed to killing Austin, but at trial he claimed that Bassett drowned Austin. *McDonald*, 138 Wn.2d at 684. At trial, Bassett denied killing his brother. *Bassett*, 1999 WL 100872, at *1.

[6] In June 2014, the Washington legislature responded to *Miller*, 567 U.S. 460, by enacting the *Miller*-fix statute, which requires that a sentencing court take into account the *Miller* factors before sentencing a 16- to 18-year-old offender to life without parole or early release. RCW 10.95.030(3)(a)(ii), (b). The legislature further enacted a statute that requires that juveniles sentenced before 2014 to life without parole or early release be resentenced under the *Miller*-fix statute. RCW 10.95.035(1).

Bassett offered mitigation information including evidence of rehabilitation and submitted over 100 pages of supporting documentation.

The mitigation evidence documented Bassett's home life, high school education, and general lack of a criminal history. The mitigation evidence also included evidence of Bassett's rehabilitation during imprisonment, including his participation in various workshops and counseling programs, educational achievements including attaining honor roll in community college and various trade certifications, marriage, infraction-free prison record since 2003, and mentorship of other inmates. Eighteen inmates and six noninmates wrote letters that supported mitigation of Bassett's sentence, including a letter that noted Bassett was a teacher's assistant in a prison community college program.

Dr. Jeffrey Hansen, who had counseled Bassett in 1995, testified at the resentencing hearing. Dr. Hansen reported that around 1995, Bassett ran away from home sometimes to hurt his mother, was still trying to establish his identity, had average cognitive ability, had suffered a self-induced alcohol overdose at age 15, had ongoing relational issues with his parents and felt hopeless, and had an adjustment disorder resulting in poor emotional behavioral responses to stress. Dr. Hansen further testified that Bassett faced the stressors of homelessness, joblessness, and possibly having had an unwanted sexual relationship with McDonald.

Bassett stated that when he entered prison as a juvenile, he first thought of how much trouble he would be in when his parents learned that he was in prison because the reality of his crimes "didn't click." Report of Proceedings (RP) (Jan. 30, 2015) at 80. Three weeks after the murders, Bassett had written, "I wish I hadn't done anything because now I think of all the good times that my dad and me had. Before I was just thinking about all of the things they did to piss

4

me off." Clerk's Papers (CP) at 294. Bassett expressed remorse at resentencing and explained the challenges that he faced as a homeless youth at 16.

The State did not rebut Bassett's evidence; rather, the State argued that compared to the severity of Bassett's crimes, the mitigation evidence did not show that Bassett should be considered for parole or early release. The State opposed a reduction in Bassett's sentence and argued that Bassett's crimes were premeditated, calculated acts and that no evidence demonstrated an acceptable explanation or excuse for the crimes.

### III. RESENTENCING COURT'S CONCLUSIONS

The resentencing court acknowledged that it had a duty to consider the *Miller* factors and not to make a decision based upon the horrific circumstances of the crime alone. Further, the resentencing court noted that it had to assess Bassett's degree of responsibility and whether Bassett's crimes were the result of immaturity, impulsiveness, and emotion stimuli that caused Bassett to "snap." RP (Jan. 30, 2015) at 85.

The resentencing court concluded that Bassett's two previous attempts to commit the crimes and his stealing a gun in advance, fashioning a silencer, and cutting the phone lines evinced that Bassett had not acted from emotion or impulse. Bassett appreciated his actions' risks and consequences because he "did several things to try to reduce his risk" and fled after the crimes. RP (Jan. 30, 2015) at 89. The resentencing court noted Bassett's strained relationship with his family, which it determined was by Bassett's choice, and found no evidence of abuse or neglect. Further, Bassett's homelessness meant that he was potentially more responsible and in control of his behaviors than other 16-year-olds. In the resentencing court's view, teenage homelessness

"cause[s] 15 and 16-year-olds to grow up pretty quickly" and to "gain a level of maturity much quicker than kids who are not in that situation." RP (Jan. 30, 2015) at 88-89.

When the resentencing court considered the *Miller* factors, it concluded that Bassett's infraction-free record did not carry "much weight in terms of assessing the likelihood that he can be rehabilitated or has been." RP (Jan. 30, 2015) at 90. Bassett's educational endeavors and trade certificates were "less evidence of rehabilitation and more evidence that [Bassett was] simply doing things to make his time in prison more tolerable" and to pass the time, and Bassett's marriage was "certainly not evidence of rehabilitation." RP (Jan. 30, 2015) at 91.

The resentencing court found that the evidence about the crimes' commission outweighed the mitigating nature of Bassett's adolescence. In doing so, the resentencing court concluded that Bassett's crimes "were the result of a cold and calculated and very well planned goal of eliminating his family from his life. And I don't believe that any amount of time in prison is going to ever result in his being rehabilitated such that he could safely return to any community." RP (Jan. 30, 2015) at 93. The resentencing court imposed three consecutive life without parole sentences. Bassett appeals.

ANALYSIS

I. BASSETT'S CLAIMS ARE NOT PROCEDURALLY BARRED

As an initial matter, the State argues that a PRP, not a direct appeal, was the proper method for Bassett to seek review of his resentencing. The State acknowledges that we may waive this procedural defect to reach the merits of Bassett's claims but argues that Bassett's claims must meet the PRP standards of RAP 16.4. We agree.

6

The legislature provided for certain juveniles sentenced to life without release or parole before June 1, 2014 to be resentenced consistently with RCW 10.95.030. RCW 10.95.035. RCW 10.95.030(3)(b) requires a court setting a minimum term for a 16- to 18-year-old offender who committed aggravated first degree murder to take into account "mitigating factors that account for the diminished culpability of youth as provided in *Miller*." "The court's order setting a minimum term is subject to review to the same extent as a minimum term decision by the parole board before July 1, 1986." RCW 10.95.035(3). Before July 1, 1986, review of a parole board decision setting a minimum term was obtained by filing a PRP. *In re Pers. Restraint of Rolston*, 46 Wn. App. 622, 623, 732 P.2d 166 (1987).

In order to facilitate review of a minimum term decision on the merits, we may disregard a filing defect and treat a direct appeal as a PRP. *Rolston*, 46 Wn. App. at 623. Thus, although a PRP is the proper method for Bassett to seek review of his resentencing, we disregard this procedural defect and treat Bassett's appeal as a PRP. *See* RCW 10.93.035(3); *Rolston*, 46 Wn. App. at 623.

To obtain relief under a PRP where no prior opportunity for judicial review was available, a petitioner must show that he is restrained under RAP 16.4(b) and that the restraint is unlawful under RAP 16.4(c). *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 299, 88 P.3d 390 (2004). Bassett has had no prior opportunity for judicial review of these claims; accordingly, we consider whether Bassett's restraint is unlawful. *See Isadore*, 151 Wn.2d at 299.

## II. LIFE WITHOUT PAROLE SENTENCES FOR THOSE WHO COMMITTED CRIMES AS JUVENILES ARE UNCONSTITUTIONAL

We are asked to decide whether the *Miller*-fix statute, RCW 10.95.030(3)(a)(ii), violates article I, section 14 of the Washington State Constitution. We conclude that sentences providing

for life without parole or early release under the relevant portion of the *Miller*-fix statute are unconstitutional for juveniles who commit crimes when they are under the age of 18.[7]  Because we agree that the *Miller*-fix statute violates the Washington State Constitution, we do not reach Bassett's alternative arguments that the statute is unconstitutional under the federal constitution's Eighth and Sixth Amendments.[8]

A.  PRINCIPLES OF LAW

A statute's constitutionality is a question of law, which we review de novo.  *State v. Hunley*, 175 Wn.2d 901, 908, 287 P.3d 584 (2012).  We presume statutes are constitutional, and the party challenging a statute's constitutionality has the burden of proving otherwise beyond a reasonable doubt.  *Hunley*, 175 Wn.2d at 908.  The Washington Constitution, article I, section 14, prohibits the infliction of "cruel punishment."  The state cruel punishment proscription affords greater protection than its federal counterpart.  *State v. Manussier*, 129 Wn.2d 652, 674, 921 P.2d 473 (1996).

---

[7] For simplicity, we refer to offenders who committed their crimes when they were under the age of 18 as "juvenile offenders."

[8] Bassett argues that we should reverse his sentences under the federal and state constitutions, as well as for nonconstitutional reasons.  Where we can fairly resolve a case on nonconstitutional grounds, we will avoid deciding constitutional questions.  *State v. McEnroe*, 179 Wn.2d 32, 35, 309 P.3d 428 (2013) (quoting *Cmty. Telecable of Seattle, Inc. v. City of Seattle*, 164 Wn.2d 35, 41, 186 P.3d 1032 (2008)).  Here, we decide the case on constitutional grounds because Bassett's nonconstitutional arguments fail for the reasons discussed in the unpublished portion of our opinion.

B.  EVOLUTION OF PERMISSIBLE JUVENILE PUNISHMENT

1.    FEDERAL LAW

In *Roper v. Simmons*, the United States Supreme Court banned the death penalty for juvenile offenders. 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). And in *Graham v. Florida*, it banned life without parole sentences for juveniles who did not commit homicides. 560 U.S. 48, 82, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). In both cases, the Court stated that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 73 (quoting *Roper*, 543 U.S. at 573). The *Graham* court stated that some juvenile offenders have sufficient psychological maturity and demonstrate sufficient depravity to merit a life without parole sentence. 560 U.S. at 77. But "it does not follow that courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." *Graham*, 560 U.S. at 77.

In 2012, in *Miller*, the Supreme Court banned mandatory life without parole sentences for juvenile homicide offenders. 132 S. Ct. at 2475. Referring to *Roper* and *Graham*, the Court stated that it has been established that children are "constitutionally different from adults for purposes of sentencing." *Miller*, 132 S. Ct. at 2464. The Court reiterated the findings from *Roper* and *Graham* that children's lack of maturity and underdeveloped sense of responsibility lead to recklessness, impulsivity, and heedless risk taking. *Miller*, 132 S. Ct. at 2464. Children are also more vulnerable to negative influence and outside pressure from family and peers, have limited control over their environments, and lack the ability to extricate themselves from horrific, crime-producing settings.

*Miller*, 132 S. Ct. at 2464. Further, because a child's character is not as well formed as an adult's, the child's traits are less fixed, and his actions are less likely to be evidence of irretrievable depravity. *Miller*, 132 S. Ct. at 2464.[9]

Citing *Graham*, *Miller* noted that for youth, life without parole is an especially harsh punishment because the juvenile will almost inevitably serve more years and a greater percentage of his life in prison than an adult offender. 132 S. Ct. at 2466. *Graham* also likened life without parole sentences to the death penalty for juveniles, stating that a life without parole sentence "'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" 560 U.S. at 70 (alteration in original) (quoting *Naovarath v. State*, 105 Nev. 525, 526, 779 P.2d 944 (1989)).

Thus, the *Miller* Court mandated that "a sentencer [must] follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." 132 S. Ct. at 2471. The characteristics to be considered include: chronological age, "immaturity," "impetuosity," "failure to appreciate risks and consequences," the surrounding

---

[9] *Miller*, *Roper*, and *Graham* further emphasized that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 132 S. Ct. at 2465. Deterrence is a flawed rationale because of juveniles' impulsivity and inability to consider the consequences of their actions. *Miller*, 132 S. Ct. at 2465. Retribution's focus on blameworthiness does not justify a life without parole sentence because juveniles have severely diminished moral culpability. *Miller*, 132 S. Ct. at 2465. Incapacitation fails to justify a life without parole sentence because adolescent development diminishes the likelihood that an offender forever will be a danger to society. *Miller*, 132 S. Ct. at 2465. In other words, incorrigibility is "'inconsistent with youth.'" *Miller*, 132 S. Ct. at 2465 (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 72-73). Finally, rehabilitation does not justify a life without parole sentence because such a sentence precludes hope for a child's ultimate rehabilitation. *Miller*, 132 S. Ct. at 2465.

family and home environment, "the circumstances of the homicide offense, including the extent of his participation in the conduct" and any pressures from friends or family affecting him, the inability to deal with police officers and prosecutors, incapacity to assist an attorney in his defense, and the possibility of rehabilitation. *Miller*, 132 S. Ct. at 2468. But *Miller* "d[id] not categorically bar a penalty for a class of offenders or type of crime." 132 S. Ct. at 2471. Rather, the Court noted that the appropriate occasion for sentencing a juvenile homicide offender to life without parole will be "uncommon." *Miller*, 132 S. Ct. at 2469.

In *Montgomery v. Louisiana*, the Court held that *Miller* applied retroactively to offenders who were juveniles when they committed their crimes and who have challenged life sentences under the Eighth Amendment of the federal constitution. ___ U.S. ___, 136 S. Ct. 718, 725, 736, 193 L. Ed. 2d 599 (2016). The Court stated that *Miller* did not require a *finding of fact* regarding a child's irreparable corruption before a juvenile could be sentenced to life without parole. *Montgomery*, 136 S. Ct. at 735. Rather, *Miller* established a substantive rule that juveniles whose crimes reflect "only transient immaturity—and who have since matured—will not be forced to serve" a life without parole sentence. *Montgomery*, 136 S. Ct. at 736. Life without parole is constitutional only for "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734. Thus, "prisoners who have shown an inability to reform will continue to serve life sentences." *Montgomery*, 136 S. Ct. at 736. "The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S. Ct. at 736.

Although the *Montgomery* Court did not determine whether the defendant was eligible for parole consideration or resentencing, the Court noted that the type of evidence that the defendant

submitted was an example of the "kind of evidence that prisoners might use to demonstrate rehabilitation." *Montgomery*, 136 S. Ct. at 736. This evidence included submissions showing the petitioner to be a "model member of the prison community" who established a boxing team of which he became a trainer and coach, contributed time and labor to the prison silkscreen department, and strived to offer advice and to be a role model to other inmates. *Montgomery*, 136 S. Ct. at 736.

2.      WASHINGTON STATE'S *MILLER*-FIX

In Washington, before *Miller*, life without possibility of release or parole was the mandatory sentence for aggravated first degree murder regardless of the offender's age. Former RCW 10.95.030 (1993). In response to *Miller*, the legislature amended RCW 10.95.030 (the "*Miller*-fix" statute) to state,

> (3)(a)(i) Any person convicted of the crime of aggravated first degree murder for an offense committed prior to the person's sixteenth birthday shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of twenty-five years.
> (ii) Any person convicted of the crime of aggravated first degree murder for an offense committed when the person is at least sixteen years old but less than eighteen years old shall be sentenced to a maximum term of life imprisonment and a minimum term of total confinement of no less than twenty-five years. *A minimum term of life may be imposed, in which case the person will be ineligible for parole or early release.*
> (b) In setting a minimum term, the court must take into account mitigating factors that account for the diminished culpability of youth as provided in [*Miller*] including, but not limited to, the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.

RCW 10.95.030 (emphasis added).

The legislature also enacted RCW 10.95.035(1), which provided that persons sentenced before June 1, 2014 to life without parole or early release for aggravated murder committed when they were under the age of 18 would be resentenced consistently with RCW 10.95.030.

### C. CATEGORICAL BAR ANALYSIS OR *FAIN*'S PROPORTIONALITY ANALYSIS

Bassett argues that the imposition of life without parole or early release sentences on juvenile offenders under the *Miller*-fix statute violates the cruel punishment clause in article I, section 14 of the Washington Constitution. Bassett urges us to apply the categorical bar analysis, as used in *State v. Sweet*, 879 N.W.2d 811 (Iowa 2016), to determine the *Miller*-fix statute's constitutionality, rather than the traditional proportionality analysis from *State v. Fain*.[10] The State argues that Iowa's *Sweet* decision is not binding on Washington courts, so that we are confined to applying the *Fain* analysis. We disagree with the State and adopt and apply the categorical bar analysis from *Sweet*.

### 1. CATEGORICAL BAR ANALYSIS

Bassett urges us to follow the reasoning found in *Sweet*. *See* 879 N.W.2d 811. Thus, we begin by examining *Sweet*'s distillation of the categorical bar analysis. In *Sweet*, the Iowa Supreme Court held that juvenile life without parole sentences categorically violate article I, section 17 of the Iowa Constitution. 879 N.W.2d at 839. Article I, section 17 of the Iowa Constitution matches the federal Eighth Amendment—both ban "cruel and unusual punishment." The *Sweet* court stated that as a general rule, "[w]hen a different standard is not presented under the Iowa Constitution, . . . we apply the federal framework, reserving the right to apply that framework in a fashion different

---

[10] 94 Wn.2d 387, 617 P.2d 720 (1980).

from federal precedents." 879 N.W.2d at 817. Thus, the *Sweet* court applied a two-step federal framework set out in *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014). 879 N.W.2d at 835.

In *Lyle*, the Iowa Supreme Court considered whether a statute mandating a minimum sentence for nonhomicide juvenile offenders violated article I, section 17 of the Iowa Constitution. 854 N.W.2d at 380. Lyle claimed that the sentencing statute violated article I, section 17 when applied to all juveniles prosecuted as adults because the mandatory sentence did not allow the court to consider any circumstances based on youthful attributes or the mitigating circumstances of the conduct. *Lyle*, 854 N.W.2d at 380. Acknowledging that state constitutional protections may be more stringent than federal constitutional protections, the *Lyle* court stated that the argument advanced by Lyle was that the court should apply the federal framework set out in *Miller*, but in a more stringent fashion. 854 N.W.2d at 384. Thus, the *Lyle* court concluded that it was appropriate to apply "the federal analytical framework" to decide the case. 854 N.W.2d at 384.

Before applying the framework to the facts of the case, the *Lyle* court acknowledged the two general classifications of cruel and unusual sentences:

> "In the first classification the Court consider[ed] all of the circumstances of the case to determine whether [a term-of-years] sentence is unconstitutionally excessive." [*Graham*, 560 U.S. at 59.] We recognize this classification under the Iowa Constitution, but refer to these sentences as "*grossly disproportionate*." [*State v. Bruegger*, 773 N.W.2d 862, 873 (Iowa 2009).] The second classification *contemplated categorical bars* to imposition of the death penalty irrespective of idiosyncratic facts. [*Graham*, 560 U.S. at 60.] This classification of cases has traditionally "consist[ed] of two subsets, one considering the nature of the offense, *the other considering the characteristics of the offender*." [*Graham*, 560 U.S. at 60.] In short, the death penalty simply cannot be imposed on certain offenders or for certain crimes. For instance, no offender can be sentenced to death—regardless of their personal characteristics—if only convicted of a nonhomicide offense and they did not intend to cause the death of another. [*Kennedy v. Louisiana*, 554 U.S. 407, 438, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008).] Additionally, a death penalty cannot be imposed, irrespective of the crime, on an intellectually disabled criminal

offender, [*Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)], or a juvenile offender, [*Roper*, 543 U.S. at 578].

854 N.W.2d at 385 (first alteration in original) (emphasis added).

*Lyle* further noted that *Miller* expanded on the second classification, categorical bars under the Eighth Amendment:

*Miller* added to this jurisprudence by conjoining two sets of caselaw: outright categorical prohibitions on certain punishments for certain crimes or against certain offenders . . . with another line of cases requiring a sentencer have the ability to consider certain characteristics about the offender as mitigating circumstances in favor of not sentencing the offender to death . . . . Although *Miller* did not identify its holding as a categorical rule, *it essentially articulated a categorical prohibition on a particular sentencing* practice. . . . Yet, *Miller* implemented a categorical prohibition by requiring the sentencing court to consider the offender's youth along with a variety of other individual facts about the offender and the crime to determine whether the sentence is appropriate. . . .
. . . *Miller* effectively crafted *a new subset of categorically unconstitutional sentences: sentences in which the legislature has forbidden the sentencing court from considering important mitigating characteristics of an offender whose culpability is necessarily and categorically reduced as a matter of law, making the ultimate sentence categorically inappropriate.*

854 N.W.2d at 385-86 (emphasis added).

*Lyle* then explained the usual two-step analysis of a categorical challenge to a sentence:

First, we consider "objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue." [*Graham*, 560 U.S. at 61]. Second, we exercise our own "independent judgment" "guided by the standards elaborated by controlling precedents and by [our] own understanding and interpretation of the [Iowa Constitution's] text, history, meaning, and purpose." *See* [*Graham*, 560 U.S. at 61]. In exercising independent judgment, we consider "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." [*Graham*, 560 U.S. at 67.] We also consider if the sentencing practice being challenged serves the legitimate goals of punishment.

854 N.W.2d at 386 (some alterations in original) (internal quotation marks omitted). The first prong, consensus, is not dispositive. *Lyle*, 854 N.W.2d at 386. *Lyle* went on to apply this two-

step inquiry and in doing so considered the evolution of juvenile justice in the last decade. 854 N.W.2d at 387-404. *Lyle* concluded that mandatory minimum sentences for juvenile offenders were unconstitutional under Iowa's proscription against cruel and unusual punishment. 854 N.W.2d at 400.

After reviewing *Lyle*, the *Sweet* court opined that *Miller* and *Montgomery* established that life without parole sentences for juvenile offenders are not available under the federal constitution even for heinous crimes except in very rare cases. 879 N.W.2d at 835. The *Sweet* court concluded that

> [t]he only marginal issue remaining under the Iowa Constitution is whether we should continue to reserve the possibility that a juvenile offender may be identified as "irretrievable" at the time of sentencing, or whether that determination must be made by the parole board at a later time after the offender's juvenile brain has been fully developed and a behavior pattern established by a substantial period of incarceration.

879 N.W.2d at 835. The *Sweet* court then applied the categorical bar analysis to determine whether life without parole for the rarest juvenile offenders passed muster under the more protective Iowan cruel and unusual punishment clause. 879 N.W.2d at 835. In other words, following *Lyle*'s lead, the *Sweet* court applied a traditionally federal framework to address a state constitutional challenge. *Sweet* held that all life without parole sentences for juvenile offenders offended the Iowa State Constitution. 879 N.W.2d at 839. Bassett urges us to similarly hold that all juvenile life without parole or early release sentences under the *Miller*-fix statute violate our state constitution.

2.    *FAIN* PROPORTIONALITY ANALYSIS

The State argues that *Sweet* is not controlling and that we should follow our traditional approach. Thus, we next examine the traditional *Fain* proportionality analysis. *Fain* held that RCW 9.92.090 (the habitual criminal statute) constituted cruel punishment under the state constitution. 94 Wn.2d at 402-03. The court emphasized that Fain did not challenge the facial constitutionality of the habitual criminal statute, including the legislature's decision to enhance the penalty for recidivists, but squarely addressed the "disproportionality between the nature of his crimes and the life sentence imposed as punishment for the three offenses which deprived the victims of less than $470 over a period of 17 years." 94 Wn.2d at 391. *Fain* analyzed federal Supreme Court precedent and distilled a "proportionality doctrine" that existed "[i]n addition to the traditional view that the Eighth Amendment proscribes certain modes of punishment." 94 Wn.2d at 395-96. "While not expressly adopted by the judiciary in Washington, the [proportionality] principle is implied in some of our cases" and legislative enactments. *Fain*, 94 Wn.2d at 396. *Fain* borrowed a four-factor proportionality analysis from a Fourth Circuit federal case that also involved a life sentence imposed under a habitual criminal statute: *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973). 94 Wn.2d at 397.

The four *Fain* factors to consider in analyzing whether punishment is prohibited as cruel under article I, section 14 are "'(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction.'" *State v. Witherspoon*, 180 Wn.2d 875, 887, 329 P.3d 888 (2014) (quoting *State v. Rivers*, 129 Wn.2d 697, 713, 921 P.2d 495 (1996)).

3.   ADOPTING THE CATEGORICAL ANALYSIS

As in Iowa, Washington has recognized the two general classifications of cruel and unusual sentences that violate the Eighth Amendment:  those that are disproportionate and those that are categorically barred.  *See State v. Schmeling*, 191 Wn. App. 795, 799-800, 365 P.3d 202 (2015). In *Schmeling*, we analyzed whether RCW 69.50.4013 (which makes drug possession a felony regardless of the defendant's mental state) violated the Eighth Amendment.  191 Wn. App. at 797. In doing so, we recognized that "[t]here are two types of Eighth Amendment analysis": proportionality analysis and the use of "categorical rules to define constitutional standards for certain classes of crimes or offenders." *Schmeling*, 191 Wn. App. at 798.  The categorical analysis requires both the review of objective indicia of societal standards expressed through legislative enactments and state practice to determine whether there is a national consensus and the exercise of independent judgment.  *Schmeling*, 191 Wn. App. at 799-800 (quoting *Graham*, 560 U.S. at 61).  In dicta, we noted that Washington applies the *Fain* analysis under the cruel punishment clause.  *Schmeling*, 191 Wn. App. at 798 n.3.  But in *Schmeling*, the defendant brought his challenge under only the Eighth Amendment, so that the court did not need to determine whether the statute was constitutional under state law.  191 Wn. App. at 798 n.3.

Further, our Supreme Court has recognized that "[A]rticle I, Section 14 of the state constitution, *like the Eighth Amendment*, proscribes disproportionate sentencing *in addition to certain modes of punishment.*"  *Manussier*, 129 Wn.2d at 676 (emphasis added); *see also State v. Ramos*, 187 Wn.2d 420, 455, 387 P.3d 650 (2017) ("We do not foreclose the possibility that this court may reach a similar conclusion [to *Sweet*'s application of categorical bar analysis] in a future case.").  Thus, although Washington courts recognize the categorical analysis's existence, unlike

Iowa, our courts have to date stopped short of applying the two-step categorical analysis to evaluate a statute's constitutionality under the *state* cruel punishment clause.

Although no Washington case has applied the categorical bar analysis, we further note that in interpreting the cruel punishment clause, our courts have twice borrowed analytical frameworks from federal case law interpreting the Eighth Amendment. *See Fain*, 94 Wn.2d at 397; *State v. Smith*, 93 Wn.2d 329, 339-40, 610 P.2d 869 (1980). *Fain* drew the four-part proportionality analysis directly from a Fourth Circuit federal case. 94 Wn.2d at 396-97 (citing *Hart*, 483 F.2d at 140-43). And in *Smith*, the court analyzed a claim brought under both the federal and state cruel punishment clauses by considering whether the punishment was "clearly arbitrary and shocking to the sense of justice," a test drawn from a Sixth Circuit case. 93 Wn.2d at 339, 344-45 (citing *Kasper v. Brittain*, 245 F.2d 92 (6th Cir. 1957)).

Thus, our precedent both recognizes the existence of the categorical bar analysis in federal case law and readily supports our drawing on federal analytical framework to resolve state constitutional issues. We next turn to reasons for abandoning the traditional *Fain* framework in this instance in favor of the categorical bar analysis.

First, the nature of Bassett's claim supports a categorical analysis under the Supreme Court's reasoning in *Graham*. There, the Supreme Court explained that categorical analysis was necessary because the defendant challenged "a sentencing practice itself," and his challenge "implicate[d] a particular type of sentence as it applie[d] to an entire class of offenders who ha[d] committed a range of crimes." *Graham*, 560 U.S. at 61. In contrast, proportionality analysis is suitable for a challenge "to a particular defendant's sentence." *Graham*, 560 U.S. at 61.

19

Here, as in *Graham*, a categorical approach is appropriate because Bassett's challenge implicates a sentencing practice as it applies to an entire class of juvenile offenders. Like *Graham*, here, "a threshold comparison between the severity of the penalty and the gravity of the crime does not advance" our analysis. 560 U.S. at 61.

Further, a categorical rule is particularly appropriate under these circumstances for the reasons discussed in *Graham*, where the Supreme Court held that the Eighth Amendment barred the option of life without parole for nonhomicide juvenile offenders:

> [A] categorical rule gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. . . . Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual. In some prisons, moreover, the system itself becomes complicit in the lack of development. . . . A categorical rule against life without parole for juvenile nonhomicide offenders avoids the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term.

560 U.S. at 79.

Second, as in *Sweet*, our State's extension of *Miller* similarly compels the application of the categorical bar analysis. In *Sweet*, the Iowa Supreme Court noted that it had "embraced" federal Supreme Court reasoning in interpreting the state constitution, as well as "built upon [that reasoning] and extended its principles." 879 N.W.2d at 832. After analyzing recent Iowa decisions, the court determined it would no longer "opt for the narrower, more incremental approach" of addressing whether the defendant was one of the extremely rare, irredeemably corrupt juveniles. *Sweet*, 879 N.W.2d at 834. Based upon "experience and the caselaw

20

developments . . . there [was] little to be gained by allowing further caselaw development" and not confronting the "larger categorical issue." *Sweet*, 879 N.W.2d at 834.

Our Supreme Court has similarly adopted and extended *Miller* in the juvenile sentencing context. In *Ramos*, the court embraced *Miller*'s reasoning that "'children are different'" and recognized the three significant gaps between juveniles and adults:

> "[A] lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivity, and heedless risk taking"; the fact that "[c]hildren are more vulnerable to negative influences and outside pressures and lack the ability to extricate themselves from horrific crime-producing settings"; and the fact "that a juvenile's actions are less likely to be evidence of irretrievable depravity."

187 Wn.2d at 445, 452 (second alteration in original) (internal quotation marks omitted) (quoting 132 S. Ct. at 2469). The court noted that *Miller* requires, at the very least, consideration of a juvenile defendant's "'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.'" *Ramos*, 187 Wn.2d at 443 (quoting *Miller*, 132 S. Ct. at 2468). Further, the sentencing court must consider "the juvenile's 'family and home environment,'" "'the circumstances of the homicide offense'" including participation and the effect of any familial or peer pressures, and "'incompetencies associated with youth.'" *Ramos*, 187 Wn.2d at 443-44 (quoting *Miller*, 132 S. Ct. at 2468). Finally, due to "'children's diminished culpability and heightened capacity for change . . . appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.'" *Ramos*, 187 Wn.2d at 444 (alteration in original) (quoting *Miller*, 132 S. Ct. at 2469).

Our Supreme Court has also extended *Miller*'s protections beyond its holding. In *Ramos*, which extended *Miller* to juveniles sentenced for multiple homicides or to de facto life sentences, the court stated,

> *Miller*'s reasoning clearly shows that it applies to *any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation. . . .*
>
> . . . [N]othing about *Miller* suggests its individualized sentencing requirement is limited to single homicides because "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*." *Miller*, 132 S. Ct. at 2465 (emphasis added). . . .
>
> . . . .
>
> . . . [Similarly,] we also reject the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences. Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same.

187 Wn.2d at 438 (emphasis added).

The court also extended *Miller*'s reasoning in *State v. O'Dell* when it held that a defendant's youth supports departure from a standard sentencing range. 183 Wn.2d 680, 690, 358 P.3d 359 (2015). The court noted the scientific studies underlying *Miller*, *Roper*, and *Graham* and establishing a "clear connection between youth and decreased moral culpability for criminal conduct." *O'Dell*, 183 Wn.2d at 695. Accordingly, youth was likely to diminish a defendant's culpability and could amount to a substantial and compelling factor that justified a below-standard-range sentence. *O'Dell*, 183 Wn.2d at 695-96. And in *State v. S.J.C.*, our Supreme Court considered *Miller* when it analyzed juvenile record sealing practices and noted that the material differences between juveniles and adults have constitutional implications. 183 Wn.2d 408, 428, 352 P.3d 749 (2015).

Most recently, in *State v. Houston-Sconiers*, our Supreme Court addressed *Miller*'s applicability to juvenile defendants who had received lengthy mandatory sentences that were attributable to firearm sentencing enhancements and lacked the possibility of early release. ___

Wn.2d ___, 391 P.3d 409, 2017 WL 825654, at *1, *3. The court acknowledged that the United States Supreme Court had yet to extend *Miller* to the situation of "26 and 31 year [sentences] for . . . robberies." 2017 WL 825654, at *7. Regardless, our Supreme Court held that the Eighth Amendment and *Miller* required that "sentencing courts must have absolute discretion to depart as far as they want below otherwise applicable [Sentencing Reform Act of 1981, ch. 9.94A RCW,] ranges and/or sentencing enhancements when sentencing juveniles in adult court, regardless of how the juvenile got there." 2017 WL 825654, at *1.

Thus, examination of our precedent illustrates that our Supreme Court has adopted and applied *Miller*'s reasoning beyond its holding. Similar to the Iowa precedent examined in *Sweet*, Washington's jurisprudence has "embraced the reasoning" of *Miller*, *Roper*, and *Graham* and has "built upon it and extended its principles." *Sweet*, 879 N.W.2d at 832.

Third, the *Fain* analysis does not adequately address the special concerns inherent to juvenile sentencing. The first *Fain* factor requires a consideration purely of the crime's characteristics. *See* 94 Wn.2d at 397-98. *Miller*, however, explicitly requires a sentencing court to consider an offender's youth and attendant characteristics before imposing a particular penalty. 132 S. Ct. at 2471. Thus, to exclusively focus on the nature of the crime and ignore the nature of the offender conflicts with *Miller*'s principles. Similarly, the fourth *Fain* factor, the punishment meted out for other offenses in the same jurisdiction, conflicts with *Miller* because it allows comparison with the punishment for *adult* offenders who commit the same crimes. *See* 94 Wn.2d at 397, 401-02. Again, this factor conflicts with the principles of *Miller*, which states that children cannot simply be treated as miniature adults for punishment purposes. 132 S. Ct. at 2470.

We hold that because our courts recognize both the categorical bar and proportionality approaches to constitutional issues and because Bassett challenges a sentencing statute as applied to a class of offenders, rather than solely the constitutionality of his sentence alone, the categorical approach is necessary. We hold, as the *Sweet* court did, that there is "little to be gained" by applying a proportionality analysis. 897 N.W.2d at 834. We apply the categorical bar analysis to the *Miller*-fix statute as set forth below.

### D. CATEGORICAL BAR ANALYSIS APPLIED TO THE *MILLER*-FIX STATUTE

1. NATIONAL CONSENSUS

Bassett argues that societal standards of decency favor banning juvenile life without parole or early release sentences based on the number of states that have abolished or functionally abandoned juvenile life without parole sentences and the direction of this change. Although the State does not address the categorical analysis, the State argues under the *Fain* analysis that "the vast majority of states" have not abolished life without parole sentences. Suppl. Br. of Resp't at 5. We agree with Bassett.

The first step to the categorical bar analysis is to consider "'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 560 U.S. at 60 (quoting *Roper*, 543 U.S. at 572). Legislation is the "'clearest and most reliable objective evidence of contemporary values.'" *Atkins*, 536 U.S. at 312 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *abrogated by Atkins*, 536 U.S. 304). In *Sweet*, the court did not find a consensus regarding whether juveniles may be sentenced to life in prison without the possibility of parole at the time of trial or whether a parole board must make such a

24

determination at a later date.  879 N.W.2d at 836.  However, the court stated that the first prong is not dispositive to the analysis.  *Sweet*, 879 N.W.2d at 836.  And it is not so much the number of states that is important, but the consistency of the change's direction.  *Atkins*, 536 U.S. at 315.

As of February 2017, 19 states and the District of Columbia have banned all juvenile life without parole sentences.[11]  Although this is not the majority of United States jurisdictions, we focus on the recent proliferation of legislative decisions to ban juvenile life without parole sentences because it is the direction of the change that matters.  *Atkins*, 536 U.S. at 315.  Before *Miller*, only 6 states and the District of Columbia banned juvenile life without parole sentences.[12] But in the five years since *Miller*, 13 more states and the District of Columbia have banned juvenile

---

[11] *See* ALASKA STAT. § 12.55.015(g) (1997); ARK. CODE ANN. § 5-4-108 (2017); COLO. REV. STAT. §§ 17-22.5-104(2)(d)(IV), 18-1.3-401(4)(b)(1) (2006); CONN. GEN. STAT. § 54-125a(f) (2015); DEL. CODE ANN. tit. 11, §§ 4209A, 4204A(d) (2013); D.C. CODE § 22-2104(a) (2001); HAW. REV. STAT. § 706-656 (2014); *Sweet*, 879 N.W.2d at 839; KAN. STAT. ANN. § 21-6618 (2010); KY. REV. STAT. ANN. § 640.040(1) (1986); *Diatchenko v. Dist. Att'y for Suffolk Dist.*, 466 Mass. 655, 674, 1 N.E.3d 270 (2013); MONT. CODE. ANN. § 46-18-222(1); NEV. REV. STAT. § 176.025 (2015); OR. REV. STAT. § 161.620 (1985); S.D. CODIFIED LAWS § 22-6-1 (2016); TEX. PENAL CODE ANN. § 12.31 (2013); UTAH CODE ANN. § 76-3-209 (2016); VT. STAT. ANN. tit. 13, § 7045 (2015); W. VA. CODE § 61-11-23 (2014); WYO. STAT. ANN. § 6-2-101(b) (2013); *see also Juvenile Life Without Parole in Philadelphia:  A Time for Hope?*, FAIR PUNISHMENT PROJECT, at 9 (2016) (not including Iowa and Arkansas), http://fairpunishment.org/wp-content/uploads/2016/03/FPP_JLWOP_philadelphia_r601.pdf.

An additional six states have functionally abandoned juvenile life without parole by having no juvenile life without parole prisoners as of March 2016.  *Juvenile Life Without Parole in Philadelphia*, at 9.  And North Dakota's legislature is considering banning juvenile life without parole.  H.B. 1195, 65th Legis. Assembly (N.D. 2017), https://legiscan.com /ND/bill/1195/2017 (last visited Apr. 18, 2017).

[12] *See* note 12, *supra*; *see also* Br. of Amici Curiae Charles Hamilton Houston Inst. for Race & Justice & the Criminal Justice Inst., at 3, *Montgomery*, 136 S. Ct. 718, http://www.scotusblog.com/wp-content/uploads/2015/08/Montgomery_CHHIRJ-and-CriminalJusticeInstitute-Amicus.pdf (last visited Apr. 18, 2017).

life without parole sentences, and 11 states did so by legislative enactment.[13] Four states banned juvenile life without parole sentences in 2016 and 2017 alone, 3 by legislative enactment.[14] This movement toward banning juvenile life without parole is particularly striking in light of "the well-known fact that anticrime legislation is far more popular than legislation providing protections for persons guilty of violent crime." *Atkins*, 536 U.S. at 315. Further, among the 31 states that allow the sentence, only 4 states—Pennsylvania, Michigan, Louisiana, and California—account for half of the juvenile life without parole sentences currently being served. *Juvenile Life without Parole: An Overview*, THE SENTENCING PROJECT, at 3.[15] And the United States stands alone as the only nation to allow juveniles to serve life in prison without parole. Connie de la Vega et al., *Cruel and Unusual: U.S. Sentencing Practices in a Global Context*, UNIV. OF SAN FRANCISCO LAW SCH., at 59 (2012).[16]

Comparison with *Atkins*, in which the Supreme Court concluded there was a "national consensus" against the execution of those with intellectual disabilities, is illustrative. 536 U.S. at 316. By the time *Atkins* was decided, 19 states had legislatively barred the intellectually disabled's execution. 536 U.S. at 314-15. Seventeen of those states had done so in the 12 years immediately preceding the *Atkins* decision. 536 U.S. at 314-15. Here, 19 states currently ban juvenile life without parole sentences, and most of those states have done so within the last five years. A

---

[13] *See* note 12, *supra*.

[14] Arkansas, Iowa, South Dakota, and Utah; *see* note 12, *supra*.

[15] Http://www.sentencingproject.org/wp-content/uploads/2015/12/Juvenile-Life-Without-Parole .pdf (last visited Apr. 18, 2017).

[16] Https://www.usfca.edu/sites/default/files/law/cruel-and-unusual.pdf (last visited Apr. 18, 2017).

comparison with *Atkins* compels the conclusion that a national consensus is building against juvenile life without parole sentences.

We hold that objective indicia of societal standards expressed through legislative enactments and state practice illustrate a building of national consensus against juvenile life without parole sentences. Accordingly, the first prong of the categorical bar analysis favors holding that our *Miller*-fix statute allowing for the imposition of a juvenile life without parole or release sentence is unconstitutional.

2.    INDEPENDENT JUDGMENT

Bassett argues that imposing juvenile life without parole or early release sentences is unworkable under Washington's broader protection against cruel punishment. The State does not address this argument. We agree with Bassett.

The second step of the categorical bar analysis is to make an independent judgment of whether the punishment in question violates our State's cruel punishment proscription. *Sweet*, 879 N.W.2d at 836. In *Sweet*, the court explained that "the enterprise of identifying which juvenile offenders are irretrievable at the time of trial is simply too speculative" and that *Miller* asks "the sentencer to do the impossible." 879 N.W.2d at 836-37.

Informed by our precedent embracing and extending *Miller*, we turn to whether, in our independent judgment, a juvenile life without parole or early release sentence is permissible under Washington's cruel punishment proscription. To begin, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573.

This leads to the fundamental problem with our *Miller*-fix statute: the sentencing court is placed in the impossible position of predicting from its application of the *Miller* factors which juveniles will prove to be irretrievably corrupt. The sentencing court must separate the irretrievably corrupt juveniles from those whose crimes reflect transient immaturity—a task even expert psychologists cannot complete with certainty. Thus, the *Miller*-fix statute results in an unacceptable risk that juvenile offenders whose crimes reflect transient immaturity will be sentenced to life without parole or early release because the sentencing court mistakenly identifies the juvenile as one of the uncommon, irretrievably corrupt juveniles.[17] *See* RCW 10.95.030(3)(a)(ii).

Further, the sentencing court's task is made even more difficult under Washington law because Washington's cruel punishment clause provides greater protection than its federal counterpart. Under federal law, life without parole sentences for juvenile homicide offenders are to be "uncommon" and "'rare.'" *Ramos*, 187 Wn.2d at 435, 450 (quoting *Montgomery*, 136 S. Ct. at 734). Thus, to comport with Washington's broader protections, life without parole or early release sentences may be imposed upon only the *most* uncommon and *rarest* of offenders, an impossible determination for the sentencing court to make when faced with a juvenile offender.

---

[17] Moreover, as *Miller* noted, juveniles' distinctive characteristics undermine the justifications for imposing harsh sentences on juvenile offenders. *See* 132 S. Ct. at 2465. In particular, the potential of life without parole sentences is unlikely to deter juvenile crime because the failure to appreciate risk is a hallmark of immaturity. *Miller*, 132 S. Ct. at 2465; Katherine Hunt Federle, *The Right to Redemption: Juvenile Dispositions and Sentences*, 77 LA. L. REV. 47, at 61 (2016). And life without parole sentences do not well further the retribution rationale because juveniles are less culpable as a class and a life without parole sentence is comparatively harsher for a juvenile than for an adult. *Miller*, 132 S. Ct. at 2465; Federle, *supra*, at 61-62.

Additionally, the factors identified in *Miller* provide little guidance for a sentencing court and do not alleviate the unacceptable risk identified. We find persuasive *Sweet*'s criticism of the *Miller* factors:

> [Consideration of] the offender's family and home environment . . . is . . . fraught with risks. For example, what significance should a sentencing court attach to a juvenile offender's stable home environment? Would the fact that the adolescent offender failed to benefit from a comparatively positive home environment suggest he or she is irreparable and an unlikely candidate for rehabilitation? Or conversely, would the offender's experience with a stable home environment suggest that his or her character and personality have not been irreparably damaged and prospects for rehabilitation are therefore greater? . . .
>
> A similar quandary faces courts sentencing juvenile offenders who have experienced horrendous abuse and neglect or otherwise have been deprived of a stable home environment. Should the offenders' resulting profound character deficits and deep-seated wounds count against the prospects for rehabilitation and in favor of life-without-the-possibility-of-parole sentences under the *Miller* framework? Or should sentencing courts view the deprivation of a stable home environment as a contraindication for life without the possibility of parole because only time will tell whether maturation will come with age and treatment in a structured environment?

*Sweet*, 879 N.W.2d at 838. In light of the speculative and uncertain nature of the *Miller* analysis, the *Miller*-fix statute creates a risk of misidentifying juveniles with hope of rehabilitation for those who are irretrievably corrupt. That is unacceptable under our State's cruel punishment proscription. For these reasons, life sentences without parole or early release for juvenile offenders as allowed under RCW 10.95.030(3)(a)(ii) are unconstitutional.

E. CONCLUSION

A categorical bar analysis is best suited to determine whether the *Miller*-fix statute violates the Washington Constitution's prohibition against cruel punishment. Under a categorical analysis, we hold that to the extent that a life without parole or early release sentence may be imposed against a juvenile offender under the *Miller*-fix statute, RCW 10.95.030(3)(a)(ii), it fails the

constitutional categorical bar analysis. Therefore, a life without parole or early release sentence is unconstitutional under article I, section 14 of our state constitution. Bassett successfully shows that his restraint is unlawful. *See Isadore*, 151 Wn.2d at 299 (citing RAP 16.4(c)). We reverse his sentence and remand for resentencing in accordance with this opinion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

FURTHER ANALYSIS

BASSETT'S NONCONSTITUTIONAL ARGUMENTS

Bassett argues that for various reasons, the resentencing court erred when it applied the *Miller*-fix statute. We address and reject these arguments in turn.

I. NO PRESUMPTION OF LIFE WITHOUT PAROLE OR EARLY RELEASE

Bassett contends that *Miller* creates a presumption against sentencing a juvenile to life without parole or early release and that the resentencing court erred because it did not apply such a presumption. Bassett further claims that the resentencing court erred because it presumed that juvenile life without parole or early release was appropriate. We disagree.

The *Miller*-fix statute requires that in setting a minimum term, the sentencing court "must *take into account* mitigating factors that account for the diminished culpability of youth as provided in *Miller*." RCW 10.95.030(3)(b) (emphasis added). But neither the *Miller*-fix statute nor *Miller* itself requires that the sentencing court apply a presumption for or against juvenile life without parole or early release when it imposes a sentence. *See* RCW 10.95.030.

30

In *Ramos*, our Supreme Court considered an argument that *Miller*'s holding, which requires a sentencing court to account for how children are different and how those differences counsel against sentencing them to life in prison, created a presumption against imposing a juvenile life without parole sentence. 187 Wn.2d at 444 (quoting *Miller*, 132 S. Ct. at 2469). The court rejected this argument. *Ramos*, 187 Wn.2d at 445 (citing *Montgomery*, 136 S. Ct. at 735). We decline to hold that under *Miller*, the resentencing court was required to apply any presumption, either for or against life without parole or early release.

## II. NO PROOF BEYOND A REASONABLE DOUBT REQUIREMENT

Bassett next argues that the resentencing court could not impose life without parole or early release unless it had proof beyond a reasonable doubt that such a sentence was appropriate. This argument fails.

The *Miller*-fix statute allows a sentencing court the discretion to impose a minimum sentence anywhere from 25 years to life without the possibility of parole or early release upon consideration of the *Miller* factors. RCW 10.95.030(3)(a)(ii), (b). However, the *Miller*-fix statute does not require that in doing so, the sentencing court find the *Miller* factors or any other circumstances by proof beyond a reasonable doubt. *See* RCW 10.95.030. Thus, we reject Bassett's argument that the resentencing court erroneously applied the *Miller*-fix statute when it did not find that life without parole or early release was appropriate by proof beyond a reasonable doubt.[18]

---

[18] Because we resolve Bassett's appeal on the state constitutional cruel punishment claim, we decline to reach Bassett's other constitutional arguments. Thus, to the extent that Bassett argues that his sentence violates the Sixth Amendment, we do not reach his argument.

### III. MEANINGFUL CONSIDERATION OF MITIGATING INFORMATION

Bassett argues that the resentencing court abused its discretion because it failed to meaningfully consider Bassett's mitigation evidence. We disagree.

The *Miller*-fix statute requires that the sentencing court take into account mitigating factors set forth in *Miller* and gives the sentencing court discretion to determine whether to impose a minimum term of life without parole or early release after considering the factors. *See* RCW 10.95.030(3); *Ramos*, 187 Wn.2d at 449. A sentencing court must consider the *capacity* for rehabilitation. *Ramos*, 187 Wn.2d at 449. However, it is within a resentencing court's discretion whether to consider evidence of actual subsequent rehabilitation at the time of resentencing to the extent that it bears upon the offender's culpability. *Ramos*, 187 Wn.2d at 449.

Here, the resentencing court considered the *Miller* mitigation factors, and the record supports its conclusions. First, the resentencing court properly focused on the nature of the crime and whether Bassett "snapp[ed]" pursuant to the *Miller* factors of the offense's circumstances and the mitigating quality of impetuosity. RP (Jan. 30, 2015) at 85; *see* 132 S. Ct. at 2468. The resentencing court concluded that during the crimes, Bassett did not act based on emotion or impulse as evidenced by the facts that he stole a gun in advance, fashioned a silencer on the gun to avoid detection, cut the phone lines, and had previously come to the home to commit the crime. These facts were supported by the record. *See McDonald*, 138 Wn.2d at 683-85.

Second, the resentencing court did not err when it disregarded Dr. Hansen's testimony. The *Miller*-fix statute requires consideration of the degree of responsibility that Bassett was capable of exercising. RCW 10.95.030(3)(b). The trial court acknowledged this factor, although it concluded that Bassett had not acted based on emotion or impulse. Again, this conclusion was

supported by the record. Although Dr. Hansen testified about Bassett's adjustment disorder and stressors, as Bassett concedes, Dr. Hansen did not testify that the murders were a direct result of Bassett's adjustment disorder limiting his ability to cope with stressors.

Third, contrary to Bassett's contention, the resentencing court did consider evidence of Bassett's family situation pursuant to the *Miller* factor of the juvenile's surrounding family and home environment. 132 S. Ct. at 2468. Here, the resentencing court acknowledged Bassett's strained relationship with his family, that Bassett's parents tried to help Bassett by taking him to Dr. Hansen, and that Bassett expressed interest in reconciling with his parents but "wasn't willing to take the necessary steps to accomplish that reconciliation." RP (Jan. 30, 2015) at 88. These findings were supported by the record. Thus, the trial court did not err.

Fourth, the resentencing court considered evidence of Bassett's immaturity pursuant to *Miller*. 132 S. Ct. at 2468. The resentencing court heard evidence of immaturity, including Bassett's alcohol overdose and running away from home to hurt his mother and that Bassett was still establishing his identity around the time that he committed the crimes. During Bassett's allocution, he stated that his first thoughts in jail were of how much trouble he would be in when his parents learned that he was in jail because the reality of his crimes "didn't click." RP (Jan. 30, 2015) at 80. He also wrote shortly after his arrest that he regretted what happened and remembered all the good times he had with his father. The resentencing court acknowledged that Bassett was 16 when the crimes occurred, but it found that the evidence about the crimes outweighed the mitigating nature of Bassett's adolescence. In doing so, the resentencing court followed the direction of *Miller*.

Fifth, the resentencing court did not err under *Miller* when it considered homelessness as a sign of maturity that did not mitigate Bassett's culpability. Although *Miller* directs a sentencing court to consider a youth's life experience and home as mitigating factors, it does not provide guidance regarding how to apply the factors. *See* 132 S. Ct. at 2468; *see also Sweet*, 879 N.W.2d at 838 (discussing the inherent uncertainty in evaluating a juvenile's home environment under *Miller*). Here, the resentencing court reflected that because Bassett was homeless, he was "almost solely responsible for himself" and may have "had a higher degree of responsibility and - and ability to control his behavior then [sic] other teenagers of that same age." RP (Jan. 30, 2015) at 88. The resentencing court further noted that although teenage homelessness was a problem in our society, those "situations . . . cause 15 and 16 year olds to grow up pretty quickly" and to "gain a level of maturity much quicker than kids who are not in that situation." RP (Jan. 30, 2015) at 88-89. And the resentencing court noted that it had not "heard anything that causes me to conclude that Mr. Bassett did not possess the ability or the capability of controlling his behavior and being responsible for his behavior." RP (Jan. 30, 2015) at 89. In light of *Miller*'s lack of guidance in applying the *Miller* factors, we decline to hold that the resentencing court erred.

Sixth, the resentencing court did not abuse its discretion when it concluded that the rehabilitation evidence did not outweigh the circumstances of the crime and other evidence pertaining to culpability. In *Ramos*, our Supreme Court held that the resentencing court has discretion about how and if it considers subsequent rehabilitation evidence in each case— "[w]hether . . . evidence [of actual demonstrated maturity and rehabilitation] should be considered at the time of resentencing to the extent that it bears on the offender's culpability is a question we leave to the discretion of the trial court in each case." 187 Wn.2d at 449. Here, we note that

Bassett presented considerable evidence demonstrating rehabilitation. In light of the resentencing court's discretion under *Ramos*, however, we cannot hold that the trial court abused its discretion when it concluded that the other evidence outweighed this rehabilitation evidence. Further, when we review a trial court's decision for an abuse of discretion, we do not substitute our own judgment for that of the trial court, and we affirm unless no reasonable person could have come to the same conclusion. *In re Det. of Duncan*, 167 Wn.2d 398, 406, 219 P.3d 666 (2009).

Bassett's abuse of discretion arguments lack merit. Accordingly, we hold that the trial court did not abuse its discretion at Bassett's resentencing.

## IV. REASSIGNMENT REQUEST

Bassett argues also that due process and the appearance of fairness entitle him to a new judge if he is granted a resentencing hearing. We disagree.

Reassignment first sought on appeal is available only in limited circumstances, including where the trial judge will exercise discretion on remand regarding the issue that triggered the appeal and has apparently prejudged the issue. *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017) (citing *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014)). We remand to a different judge where the facts in the record show that "the judge's impartiality might reasonably be questioned." *Solis-Diaz*, 187 Wn.2d at 540. "[E]ven where a trial judge has expressed a strong opinion as to the matter appealed, reassignment is generally *not* available as an appellate remedy if the appellate court's decision effectively limits the trial court's discretion on remand." *McEnroe*, 181 Wn.2d at 387.

Here, the record does not compel the conclusion that Bassett's resentencing judge's impartiality might reasonably be questioned. *See Solis-Diaz*, 187 Wn.2d at 540. We note that

when the court resentenced Bassett, it expressly acknowledged its duty to balance the *Miller* factors and that it could not make a decision based solely upon the circumstances of the crime. The resentencing court's decision to impose life without parole or early release was a reasoned application of the *Miller*-fix statute and was supported by the record as discussed. Further, on remand, our opinion prevents the resentencing court from again imposing life without parole or early release. *See McEnroe*, 181 Wn.2d at 387. Thus, we hold that reassignment to a different judge is not merited, and we reject Bassett's request.

For the reasons discussed, we reject Bassett's various arguments that the resentencing court erred when it applied the *Miller*-fix statute. We hold that the *Miller*-fix statute's provision allowing for juvenile life without parole or early release for offenders between 16 and 18 years old violates our State's cruel punishment proscription. We reverse Bassett's sentence and remand for resentencing; however, we decline to reassign the matter to a different judge.

JOHANSON, J.

We concur:

WORSWICK, P.J.

LEE, J.