IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35408-3-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 36526-3-III) |
| | ) | |
| v. | ) | |
| | ) | |
| KEVIN JEREMY BOOT, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |
| In the Matter of the Personal Restraint of: | ) | |
| | ) | |
| KEVIN JEREMY BOOT, | ) | |
| | ) | |
| Petitioner. | ) | |

LAWRENCE-BERREY, J. — In 1996, a jury convicted Kevin Boot of aggravated

murder, either as a principal or as an accomplice. The trial court sentenced him to life

without parole. When he committed the crime, he was two weeks shy of his 18th

birthday. In 2017, a successor trial court presided over his *Miller*-fix[1] resentencing and

imposed a minimum sentence of 50 years' incarceration. We reverse and remand for

resentencing. Our conclusion renders Mr. Boot's consolidated personal restraint petition

(PRP) moot.

---

[1] The Washington Legislature enacted the "*Miller*-fix" statutes, RCW 10.95.030 and 10.95.035, in response to the United States Supreme Court's ruling that mandatory life without parole sentences for juveniles are unconstitutional. *See Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

No. 35408-3-III; No. 36526-3-III
*State v. Boot*; *PRP of Boot*

FACTS[2]

In December 1994, a passerby saw the body of Felicia Reese on the Centennial

Trail in Spokane. *State v. Boot*, 89 Wn. App. 780, 783, 950 P.2d 964 (1998). Ms. Reese

had been shot in the face three times. *Id.* She was last seen at a conference; she left

around 9:00 p.m. to drive her boyfriend to work. *Id.* at 784. She did not return to the

conference or pick her boyfriend up the next morning. *Id.*

Two days later, a deputy pursued a speeding car driven by Mr. Boot and his

cousin, Jerry Boot. *Id.* The Boots abandoned the car, threw a .380 caliber pistol over a

fence, ran from the police, and were ultimately arrested. *Id.* A ballistics report verified

that the bullets removed from Ms. Reese's skull were fired from the discarded .380

caliber pistol. *Id.* Mr. Boot's cousin accepted a plea deal from the State.

Judge Tari Eitzen presided over Mr. Boot's 1996 trial. A jury found him guilty of

premeditated first degree murder.[3] In addition, the jury found two aggravating

circumstances by special verdict: (1) Mr. Boot committed the murder to conceal the

---

[2] The first four paragraphs of our facts are taken from this court's opinion on direct appeal. *See State v. Boot*, 89 Wn. App. 780, 950 P.2d 964 (1998).

[3] The jury did not find that Mr. Boot had pulled the trigger. The trial court instructed the jury on accomplice liability, the State argued accomplice liability, and the jury could well have convicted Mr. Boot as an accomplice. *Id.* at 792-94.

commission of a crime, and (2) the murder was committed in the course of or in immediate flight from first degree robbery or first degree kidnapping.

The trial court sentenced Mr. Boot to life in prison without possibility of parole. Mr. Boot appealed on grounds unrelated to this appeal. We affirmed. *Id.* at 794.

*Evolution of youth sentencing*

In 2012, the United States Supreme Court held that mandatory life imprisonment without parole is unconstitutional for juveniles convicted of homicide crimes. *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The court recognized that "children are constitutionally different from adults for purposes of sentencing" because they "have diminished culpability and greater prospects for reform . . . ." *Id.* at 471.

In response to *Miller*, our legislature amended several RCW chapters governing juvenile sentencing. *See* RCW 10.95.030; RCW 10.95.035 (the so-called "*Miller*-fix statutes"). Relevant here, RCW 10.95.035(1) provides that juveniles who were sentenced to mandatory life without parole prior to 2014 shall be returned to the sentencing court or its successor for sentencing consistent with the *Miller*-fix statutes. *State v. Delbosque*, 195 Wn.2d 106, 112, 456 P.3d 806 (2020).

3

*Mr. Boot's resentencing*

Prior to resentencing, Mr. Boot submitted a memorandum and a forensic evaluation concluding that he has changed considerably since entering prison and could transition to life in the community. He also submitted numerous letters from family, friends, and supervisors in support of his release.

On May 24, 2017, Mr. Boot appeared for resentencing before Judge Raymond Clary, Judge Eitzen's successor. Two of the detectives who had investigated Ms. Reese's murder testified. Ms. Reese's mother and family friends gave statements and advocated against releasing Mr. Boot. The court told Ms. Reese's mother, "I am as deeply and profoundly moved as I have ever been in my life." Report of Proceedings (Mar. 28, May 24, & May 26, 2017) (RP) at 65.

Relevant to this appeal are the following testimonies:

*Jeremy Wilson*

Jeremy Wilson is the community corrections officer who conducted Mr. Boot's presentence investigation. During his interview, Mr. Boot told Mr. Wilson that nobody was at fault for his behavior and nothing influenced him other than his own choices. Mr. Wilson categorized Mr. Boot's offense as "'a heinous, extremely predatory and callous crime.'" RP at 55. Mr. Wilson had doubts as to Mr. Boot's remorse because "while he

4

accepted responsibility for his current position, he continued to blame Jerry.[4]  And he

wasn't emotional about it accepting responsibility . . . .  He wasn't crying.  He wasn't

distraught.  He was speaking to me clearly, articulating his statements very well."

RP at 55.  Mr. Wilson later acknowledged that the interview was conducted by telephone,

so he could not observe Mr. Boot's body language.  As for Mr. Boot's amenability to

release, Mr. Wilson stated:

> He has taken an above average effort while in custody to seek out programs
> within the limitation of what the Department of Corrections will let him do
> currently. . . .  [H]is current counselor described [him as] very amenable,
> said if there was someone he was going to take a risk on, it would be Kevin
> [Boot].

RP at 58-59.  Mr. Wilson ultimately recommended the court resentence Mr. Boot to a

minimum term of 420 months (35 years).

*Dr. Ronald Roesch*

Dr. Ronald Roesch is a professor of psychology and a forensic mental health

specialist.  Dr. Roesch met Mr. Boot for five hours in June 2016 and prepared a detailed

report.  Dr. Roesch explained that Mr. Boot had been a good student until seventh grade,

---

[4] Mr. Wilson, the deputy prosecutor, and even Mr. Boot's resentencing counsel were under the false belief the jury found that Mr. Boot had personally pulled the trigger. As reflected in its findings, this false belief impacted the trial court's resentencing decision.

when he began smoking marijuana and drinking alcohol. Substance use hinders an

adolescent's development. Peer influence is a big factor for all youth, whose brains are

vulnerable to negative outside pressures. Mr. Boot had early adolescent mental health

issues that culminated in a suicide attempt and later inpatient residential treatment; this

behavior is consistent with impulsiveness. Mr. Boot took risks without thinking about the

consequences in order to be liked and accepted. Mr. Boot acknowledged his gang

affiliation and said he enjoyed being a member because he had access to drugs and he

liked the lifestyle, which Dr. Roesch found "went along with his risk-taking and

impulsivity at the time." RP at 95.

Regarding responsibility for the crime, the following exchange took place:

> [MR. BOOT'S COUNSEL:] Did Mr. Boot acknowledge to you his
> role in the crime?
> [DR. ROESCH:] Yes, he did.
> [MR. BOOT'S COUNSEL:] In your interview and time talking to
> Mr. Boot, did he ever express that he was not responsible for what
> happened?
> [DR. ROESCH:] No. He expressed that he was responsible for it.
> He denied doing the actual shooting and continues to deny that. . . . But he
> says he takes full responsibility. He was a full participant in the offense.
> He used those words actually that he was a full participant.
> . . . .
> [MR. BOOT'S COUNSEL:] Does his reticence to say that he pulled
> the trigger suggest to you that he has not embraced the responsibility
> associated with this offense?

[DR. ROESCH:]  Well, no.  At the same time he says he takes full responsibility for it.  He just denies that he did the actual shooting.  But he says he is [as] responsible as his cousin in this case.

RP at 89.

Mr. Boot recognized the impact his actions had on his grandmother: "He said it made him feel horrible that she was blaming herself and that's when he told her it wasn't her fault; that she had given him a stable home life; that he had screwed it up." RP at 101.

Dr. Roesch described Mr. Boot's time in prison as "variable" because he entered when he was young and, like many young offenders, he got into trouble and had difficulties transitioning into the adult prison system.  RP at 90-91.  He incurred several infractions for violence during his first five years of incarceration but his last infraction was in 2001, and he has since completed all programming available to him.  He now teaches programs to others.  Dr. Roesch opined:

I think he decided he was going to make the best of the situation he had and seemed to make a switch to make some prosocial choices.  And from reports from correctional officers there, DOC records, the correctional officer I interviewed, that seemed from their perception to be genuine; that he seemed to really focus on working with younger offenders and trying to contribute positively to the prison environment.

RP at 94.

7

Mr. Boot has had numerous jobs in prison. His supervisors indicate "he's an excellent worker; gets along well with others; loyal employee; did not need much supervision and who had a lot of talent picking up new jobs, new tasks." RP at 96. Mr. Boot's sentence restricted his employment and educational opportunities, but he has expressed interest in vocational training and other programs in the future.

Dr. Roesch administered a personality test and found Mr. Boot had no severe mental disorders. Mr. Boot's highest score was on the "antisocial feature scale," which is generally found in people who act out, get in legal trouble, disregard others' feelings, and do not take responsibility for their actions. RP at 99. This score reflects Mr. Boot's antisocial behavior as an adolescent, but his other sub-scores show that he is "not a risk-taker; . . . does not take advantage of others, feels loyalty to others, expresses guilt over past transgressions." RP at 99-100. Dr. Roesch opined that Mr. Boot had a conduct disorder when he was a teenager but that he does not have an antisocial personality disorder now. "He doesn't need to get a rush like he did when he was, he talked about when he was an adolescent. Those kind of things change as he moved into adulthood." RP at 100.

Mr. Boot's counsel asked Dr. Roesch whether "[t]he fact that Mr. Boot was within 15 days of being 18 years old" impacted his opinion on Mr. Boot's maturity. RP at 104. Dr. Roesch responded:

> Eighteen is an arbitrary bright line. In terms of developmental psychology, we talk about development continuing into the 20s. And so it's an arbitrary cutoff that we've created over the years in terms of distinguishing between adolescents and adults. And at 18 we give adolescent[s] some adult responsibilities, but not all adult responsibilities. . . . So it's a bright line in a sense that you know you have to have a cut off, I suppose, at some point, but it doesn't necessarily mean that all of a sudden at 18 you're now a fully mature adult. That's not the case.

RP at 105. When asked whether Mr. Boot was more or less mature than somebody else at his age, Dr. Roesch said: "I can only look retrospectively at his behavior at the time" but his decisions reflected he was someone "who was not thinking of future consequences of their behavior [and] was not even thinking of short-term consequences of their behavior." RP at 105.

Dr. Roesch learned that Mr. Boot's father went to prison and his mother was a drug addict who would not care for him, but his grandparents took him in and provided him a stable home. Dr. Roesch acknowledged that Mr. Boot "ended up with a better home life than many of the kids that I've seen . . . ." RP at 106.

Dr. Roesch explained the concept of irreparably corrupt youth who "don't mature"

and "continue to be violent throughout their lives." RP at 109. When asked how he

would categorize Mr. Boot, he answered:

> Well, it's limited because he has been in prison, but he's not done
> any offending since the initial period of time in prison . . . when he was in
> his late teens and early 20s. . . . [H]e has been, by all accounts, a model
> inmate since that time. It would have been difficult to assess because this
> was a heinous offense. It was a terrible crime that he committed. And so at
> the time it would have been difficult to assess whether he would be one of
> the ones who would persist into adulthood or not. But now we have the
> opportunity to assess his behaviors since then, and as I noted, given the fact
> that he has not had infractions in the last 16 years, he's regarded as a model
> inmate, involved in trying to work with younger offenders in a positive way,
> so those are indication that he may not [be irreparably corrupt].

RP at 109-10. Dr. Roesch later confirmed that he does not believe Mr. Boot is irreparably

corrupt.

Mr. Boot's counsel asked, "So is there some positive consideration that should be

given to Mr. Boot in his re[sentencing]?" RP at 110. Dr. Roesch replied:

> Well, I think that in terms of the issues that I talked about . . . those
> *Miller* factors, he seems to have become a person who is capable of making
> better decisions in his life and has shown that in the kinds of behavior he
> exemplified in prison. He is disassociated from gang involvement. He did
> that fairly early on, which I think is a positive indication. He takes
> responsibility for his behavior, including the offense.
>     . . . .
>     . . . I would expect that he could make a positive transition with that
> additional training and preparation to life after prison.

10

RP at 110-12.

On cross-examination, the State asked whether anything would have changed—as far as Mr. Boot's maturity—in the two weeks before he turned 18 years old. Dr. Roesch said there would have been no rapid brain development in two weeks. But again, Dr. Roesch explained that Mr. Boot "was a reckless, immature, antisocial kid . . . ." RP at 123. Although impulsiveness implies doing something unplanned, it also "encompasses not really thinking of the consequences . . . ." RP at 125.

On redirect, Dr. Roesch reiterated that Mr. Boot's decisions prior to committing the crime demonstrated immaturity. That he left home to gratify his immediate needs demonstrated that he was not acting like a mature 17 year old.

*Kevin Boot's allocution*

Mr. Boot apologized to Ms. Reese's family, the court, and the community. He stated: "There's no excuse really for what I did. I take full responsibility for my actions, and I work daily to make up for those actions." RP at 129. He discussed the programs he participates in and his efforts to mentor young inmates by sharing his story to "make sure there's not another victim like the one I have caused." RP at 130-31. He explained,

11

> I am not the person I was at 17.  When I look back on that person, it isn't
> who I really am.  I made a lot of mistakes in my younger life and since then
> I have taken the responsibility for what I've done and worked towards
> changing my environment.  I don't want people to be hurt.  I work daily to
> make sure that doesn't happen.

RP at 131.  He explained he intends to work with youth to prevent violence in the community if released.  He concluded, "I'm just sorry for what I did.  Ultimately, I know I can't make up for it, but I try daily to do so."  RP at 132.

A friend of Mr. Boot's stated that Mr. Boot has been supportive of her growth and maturity, and that he has a support system outside of prison.

*Arguments*

Mr. Boot's counsel argued that Mr. Boot was not irreparably corrupt and that he had matured after more than 20 years in prison.  Mr. Boot's counsel told the court, "The starting point would be 25 years," but argued that is the amount of time before Mr. Boot could even be considered for release because "there is no good time on this offense."  RP at 134-35.  The court later asked whether the standard range was "25 years being the minimum, life being the maximum," to which counsel said "Yes."  RP at 137.  Mr. Boot's counsel argued "an appropriate sentence" was 25 years.  RP at 150.

The State argued the *Miller*-fix statutes provide for "a minimum term set of 25 years . . . .  It's a . . . shall be at least 25 years . . . .  So the court [starts there and] can

adjust the minimum term to wherever [it wants] in between that range . . . ." RP at 153.

The State argued Mr. Boot was mature at the time of the crime; he was nearly 18 years

old and had been living his lifestyle for a while. He was "not your typical 17-year-old"

and was "[p]retty street savvy." RP at 163. The State argued the low end of the

minimum term was not justified and "the burden is on Mr. Boot to show that there was

transient immaturity on his part at the time of the crime" before the court could consider a

downward departure from the original sentence. RP at 157. The State argued for 60 to

65 years or "[a]t the very least, a minimum term sentence beyond the thirty five years

recommended by [the Department of Corrections]." Clerk's Papers (CP) at 51-52 (State's

resentencing memorandum). The court took the matter under advisement.

*Oral ruling*

Two days later, Judge Clary issued a lengthy oral ruling. He began by telling Ms.

Reese's mother, "I am deeply sorry for your loss." RP at 175. He went on to tell Mr.

Boot, "I have a heavy heart today in rendering this sentence. It's one of the most difficult

things, if not the most difficult thing, that a lawyer does as a judicial officer." RP at 175.

The court gave background on the case law and sentencing considerations for

juvenile offenders. It distinguished the facts of *Miller*, reasoning that those defendants

13

were 14 years old at the time of their crimes whereas Mr. Boot was "15 days away from being 18" and Mr. Boot's life was less "dysfunctional." RP at 178-79.

The court began by applying the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, criteria for juvenile resentencing. First, the punishment must be proportionate to the seriousness of the offense and the offender's criminal history. With regard to that prong, the court explained, "Mr. Boot's murder of Ms. Reese was horrific, calculated, and cold-blooded. It was, in fact, a premeditated execution . . . ." RP at 179-80. Mr. Boot had a juvenile history of six felonies, he was an established gang member, his crimes were escalating, and his "degree of responsibility was high."[5] RP at 180.

Second, the court considered whether the punishment was just. The legislature retained the discretion of a sentencing court to impose a minimum term of 25 years to a maximum of life without parole. The court noted that Division Two of this court recently decided *State v. Bassett*, 198 Wn. App. 714, 394 P.3d 430 (2017) (*Bassett* I), *aff'd*, 192 Wn.2d 67, 428 P.3 343 (2018) (*Bassett* II), which held that life without parole for a juvenile violates the Washington Constitution.

Judge Clary went on to incorporate the following factors into his decision:

---

[5] It appears both the State and Judge Clary had assumed the jury convicted Mr. Boot as a principal. As we mentioned above, this is not necessarily so.

14

*Chronological age*

The court found, "Mr. Boot was closer to being 18 and an adult than a juvenile. He was 17 years-and-three hundred-and-fifty days. He was not a child. Technically, he wasn't an adult either. He was two weeks away from that." RP at 181.

*Vulnerability to negative influence/peer pressure*

Mr. Boot had loving and supportive grandparents who gave him a nice home and an opportunity for education. He also had an incarcerated father and a mother who left early due to drug addiction. Mr. Boot "chose to move out of his grandparents' home" to live with a girlfriend and "chose to engage in escalating violence to raise his gang status." RP at 182. He told Dr. Roesch that he enjoyed gang life and continued associating with gangs for five years while in prison. As such, the evidence and circumstances did not support a finding of negative influences by family or gang peer pressure. These findings overlapped with another factor: consideration of home environment and ability to extricate oneself from adverse circumstances.

*Mental and emotional development*

The court found:

15

There was no evidence from the 1996 trial that Mr. Boot was less developed emotionally than a like person or someone who had turned 18 or who had reached the age of majority. Mr. Boot had chosen to join a gang long before the fateful day for Ms. Reese. He was a good student until he decided to take up an antisocial lifestyle and he moved out of his grandparents' home by choice and in with a woman when he was 17. He was financing his lifestyle by selling drugs, as described by witnesses in our *Miller* hearing.

RP at 182-83.

### *Possibility of rehabilitation*

The court acknowledged, "This is a strong factor for Mr. Boot" and is significant in the *Miller* and *Bassett* analyses. RP at 183. Mr. Boot's corrections officer and prison supervisor spoke very highly of him and said that "if anyone with a murder background can make it, Mr. Boot can." RP at 183. Dr. Roesch also opined that Mr. Boot could rehabilitate with access to more programs.

### *Homicide and extent of participation*

The court said it already addressed this factor, but repeated, "The jury found that Mr. Boot shot Ms. Reese three times in the face and there were aggravating factors. The jury found him to be the shooter, that he did this to cover up the crime, and he was doing this . . . to enhance his status as a gang member." RP at 184.

*Ability to appreciate wrongfulness*

The court found:

Mr. Boot was essentially an adult, 15 days from being 18. . . .  He appeared
to know the gravity of what he was doing and this understanding on his part
is corroborated by the jury expressly finding that Mr. Boot premeditatedly
murdered Ms. Reese to cover up his crimes.  His knowledge or appreciation
of the wrongfulness is further support for Mr. Boot not being a youth or
having more of an adult-like basis from which to make decisions and
engage in activity.

RP at 184.

*Impetuousness, emotion, and impulsiveness*

The court again found Mr. Boot was "essentially the age of majority and he chose

to plan a carjacking."  RP at 185.  His earlier carjacking plan had been foiled.  "He didn't

have to kidnap [Ms. Reese].  He could have just taken her purse.  He robbed her and then

executed her to cover up his kidnapping and robbery."  RP at 185.  The court contrasted

this behavior with the facts of *Miller*, where the defendants were "14 and went along with

others" and "attempt[ed] to opportunistically rob" an adult.  RP at 185.

*Recklessness, willingness to walk away, immaturity, degree of
responsibility, character traits, and ability to appreciate risk*

The court found, "Mr. Boot was more than reckless" but that "is not necessarily a

characteristic of immaturity."  RP at 185.  His crimes "were the product of intent, not

recklessness."  RP at 186.  Adult offenders do similar things.

17

The court found Mr. Boot showed no willingness to walk away from the crime and reiterated that "Mr. Boot was essentially an adult." RP at 186. Again, the court stated, "There was no evidence at the time of trial that he was less mature than most people 18 years of age. He consciously chose this lifestyle. . . . He was committed to a gang life of crime, and he stayed on that path for another five years." RP at 186. The court found Mr. Boot was capable of being responsible but chose not to be, and his unlawful character traits remained after entering prison. "We don't know whether he can be outside the structure and supervision of a prison without hurting someone or when he will be safe to society. The presentence report notes doubt about actual remorse." RP at 186.

The court reasoned that Mr. Boot "had enough appreciation for risk that he executed Ms. Reese to attempt to cover up the kidnapping and robbery." RP at 187. He "knew what he was doing and chose to do it." RP at 186-87.

### *Factors under the SRA*

The court moved on to discuss other SRA factors, starting with whether Mr. Boot's sentence would be consistent with others who committed similar crimes. The sentencing guidelines for this offense stem from an expert study and a "sentence between a minimum of at least 25 years and life with the possibility of parole would be

18

commensurate by definition of those experts." RP at 187. Mr. Boot would receive a

lighter sentence than he may have otherwise given *Bassett* I.

With regard to protecting the public and opportunity to improve himself, the court

found, "Mr. Boot committed one of the most serious crimes Spokane has seen" but that

his new sentence will allow him to participate in programs previously not available to

him. RP at 187. These programs will reduce his risk of reoffending if released, although

the court noted, "No one knows whether he can do this." RP at 188.

In conclusion, the court ruled:

> Mr. Boot, I feel constrained by *State vs. Bassett*, [198 Wn. App. 714] and working to account for the myriad of factors of higher courts and the legislature, I cannot sentence you to life without [the] possibility of parole. Given the totality of the many resentencing factors, your premeditated murder of Ms. Reese was not the result of transient youth. I'm committed to following the law. I find you should be sentenced to a minimum term of 50 years, which is 600 months, with credit for time served . . . .

RP at 189.

*Judgment and sentence*

On June 2, 2017, the court entered Mr. Boot's judgment and sentence. On

September 29, 2017, it entered findings of fact and conclusions of law that largely mirror

its oral ruling. The findings read in part:

19

2.    Mr. Boot was seventeen years and three hundred and fifty days old at the time of the offense . . . .  He was not a child and was two weeks away from being an adult.

3.    Mr. Boot had loving and supportive grandparents . . . .  He had a father in prison and a mother who left early and was addicted to drugs.  Mr. Boot chose to engage in escalating violence and leave his grandparent's home to move in with his girlfriend when he was seventeen.  The evidence does not support negative influences by family or gang peer pressure.

4.    Mr. Boot's mental and emotional development was no different than a like person or someone who had turned eighteen . . . .  He was a good student until he chose to join a gang.

5.    Mr. Boot's home environment and ability to extricate himself from adverse home circumstances is the same as findings #3 and 4 above.

6.    The possibility of rehabilitation for Mr. Boot is strong.  Mr. Boot's prison supervisor informed [his community corrections officer] . . . that if anyone with a murder background could make it, it was Mr. Boot.  Dr. Roesch . . . testified that Mr. Boot can rehabilitate if he has a sentence that gives him more access to programs. . . .

7.    Mr. Boot's murder of Ms. Reese was horrific, calculated and cold-blooded.  It was a premeditated execution. . . .

. . . .

9.    Mr. Boot was able to appreciate the wrongfulness of his act.  He was essentially an adult. . . .  The jury finding that he premeditated the murder to cover up other crimes supports this finding.

10.    Mr. Boot was also able to plan the carjacking. . . .  He was essentially at the age of majority so there was no finding of impetuousness, emotion or impulsiveness, either by chronological age or by the evidence presented to the court.

11.    Mr. Boot was more than reckless.  He chose to kill and cover up his crime.  His own expert acknowledged that adult offenders perform similar acts.  Mr. Boot continued to participate with gangs in prison for approximately five years. . . .

12.    Mr. Boot showed no willingness to walk away from the circumstance on December 27, 19[9]4.

13.     Mr. Boot was essentially an adult at the time of the crime. . . . There is finding of immaturity.

14.     Regarding the degree of responsibility Mr. Boot was capable of exercising, he could have decided to study and develop a trade like his grandfather but instead purposefully chose to follow the life of a Crips gang member.

15.     Mr. Boot's character traits remained unlawful up to five years in prison . . . .  The pre-sentence report notes doubt about actual remorse. . . .

16.     Mr. Boot was fully aware of his actions and the resulting consequences. . . .

CP at 175-77.

Based on the above findings, the court concluded:

[S]ubstantial and compelling reasons exist to depart from the guidelines and impose the sentence herein.  The court feels constrained by State v. Basset[t], 198 Wn.[ ]App. 714, 394 P.3d 430 (2017), and therefore cannot sentence to life without the possibility of parole.  The court therefore sets the minimum term of fifty (50) years['] incarceration and a maximum term of life without the possibility of parole.

CP at 177.

*Postresentencing proceedings*

On June 14, 2017, Mr. Boot appealed.  This court granted numerous extensions of time; his opening brief was ultimately filed on May 17, 2018.

On May 25, 2018, Mr. Boot filed a CrR 7.8(5) motion in the trial court claiming his resentencing counsel was ineffective.  He requested an evidentiary hearing to present witnesses and evidence in support of his motion.

21

To support his CrR 7.8 motion, Mr. Boot's appellate attorney referred him for a psychological evaluation to assess his emotional and behavioral functioning with a focus on mitigating factors relevant to resentencing. Dr. Christmas Covell met with Mr. Boot in April 2018, reviewed records, and conducted interviews. Dr. Covell's 37-page report opines that Mr. Boot "likely presented as immature and impulsive relative to adults at the time of the offense." CP at 2499. His history of negative experiences "increased his vulnerability to immature decision-making and impulsive, risk-taking behavior." CP at 2499. Reductions in those behaviors occurred in his 20s, which "reflect[s] a maturation process that occurred at this time." CP at 2500. In Dr. Covell's opinion, Mr. Boot has made significant rehabilitative changes during his incarceration, developed prosocial goals, and sought opportunities for a positive change in his current community. Dr. Covell's report concludes:

> In all, despite a significant history of early and maintained behavioral problems into his early adulthood, Mr. Boot has demonstrated a number of behaviors and changes that are associated with psychological maturation, and desistence from antisocial behavior. Improved self-regulation, resistance to peer influences, and involvement in adult roles is evident, as is Mr. Boot's efforts to change his thinking and goals, and demonstrated investment in prosocial values and the institutions within his current sub-community within prison.

CP at 2499.

22

On June 25, 2018, this court granted Mr. Boot's motion to stay the appeal pending the resolution of his CrR 7.8 motion. On October 4, 2018, after considerable briefing, the trial court transferred the CrR 7.8 motion to this court for consideration as a PRP under cause no. 36526-3-III.[6] The stay of the appeal was lifted on December 21, 2018, and this court consolidated Mr. Boot's PRP with his appeal.

In October 2019, this matter was again stayed, pending the outcome of *Delbosque*. The parties submitted supplemental briefing on *Delbosque*. In December 2020, this matter was again stayed, pending the outcome of *State v. Haag*, 198 Wn.2d 309, 495 P.3d 241 (2021). Following *Haag*, the stay was lifted and the parties submitted supplemental briefing in December 2021.

## ANALYSIS

### A.   RESENTENCING PURSUANT TO *HAAG*

Mr. Boot contends he is entitled to resentencing pursuant to *Haag*, which held that the resentencing court improperly focused on retribution over rehabilitation when imposing a 46-year minimum term on a 17-year-old offender, and also held that such a

---

[6] On November 13, 2018, the trial court entered findings of fact and conclusions of law on its CrR 7.8 transfer ruling. The findings (which were prepared by the State) discussed Mr. Boot's ineffective assistance of counsel claims. He appealed the findings, which this court ultimately dismissed as not appealable as a matter of right. *See* Comm'r's Ruling, *State v. Boot*, No. 36490-9-III (Wash. Ct. App. May 2, 2019).

term constitutes an unconstitutional de facto life sentence. We address the two grounds

for reversal under *Haag* and their applicability in turn.

*Standard of review*

We reverse a sentencing court's decision only if we find a clear abuse of discretion

or misapplication of law. *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018). A

trial court abuses its discretion if its decision is manifestly unreasonable or based on

untenable grounds. *Delbosque*, 195 Wn.2d at 116.

State v. Haag

After enduring several difficult experiences, 17-year-old Haag killed his 7-year-old

neighbor. *Haag*, 198 Wn.2d at 313. In 1995, Haag was convicted of aggravated first

degree murder and sentenced to life without parole. *Id.* In 2018, Haag was resentenced

under the *Miller*-fix statutes. *Id.* at 314. After a hearing, the trial court imposed a

minimum term of 46 years in prison and a maximum term of life. *Id.* at 316. Haag

appealed on two grounds: that his resentencing court failed to meaningfully consider the

mitigating factors, and that he received an unconstitutional de facto life sentence. *Id.*

The Court of Appeals affirmed. Our Supreme Court accepted review and reversed on

both grounds.

*De facto life sentence*

The *Haag* court held, "46 years to life amounts to a de facto life sentence for a juvenile offender because it leaves the incarcerated individual with no meaningful life outside of prison." *Id.* at 327. Juveniles like Haag, who are imprisoned before they experience the rights and responsibilities of adulthood "'such as establishing a career, marrying, raising a family, or voting,'" are unable to meaningfully reenter society. *Id.* (quoting *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 77, 115 A.3d 1031 (2015)). Sentencing a 17-year-old offender to 46 years in prison "means they will miss out on the developments of the world" and "inevitably fall behind," making "readjustment to life on the outside difficult." *Id.* Citing with approval numerous out-of-state cases, the court reasoned, "life is more than just life expectancy . . . ." *Id.* at 328. A juvenile who is released in his or her 60s "has lost incalculably more than an adult in the same circumstances" despite the juvenile's decreased culpability. *Id.* at 329. The court concluded:

> Haag, having committed a terrible crime at the age of 17, deserved and received punishment—but given the shortened life expectancy and compromised health associated with life in prison, releasing Haag from confinement at the age of 63 deprives him of a meaningful opportunity to return to society, depriving him of a meaningful life. Haag's sentence is therefore a de facto life sentence.

*Id.* (citation omitted).

25

Mr. Boot argues, and the State concedes, that his 50-year minimum term is an unconstitutional de facto life sentence under *Haag*. Mr. Boot, like Haag, was 17 years old when he committed first degree aggravated murder. His sentence exceeds the unconstitutional 46-year sentence in *Haag* by four years. We therefore accept the State's concession and remand for resentencing consistent with the remainder of this opinion.

*Retribution over rehabilitation*

Although the above issue is dispositive, we address Mr. Boot's alternative argument to provide guidance on remand. *See State v. Orozco*, 19 Wn. App. 2d 367, 378 n.4, 496 P.3d 1215 (2021) ("In the interest of judicial economy, we sometimes address issues beyond the dispositive issue if their resolution will be helpful to the trial court."). Mr. Boot argues resentencing is warranted because Judge Clary, like the resentencing judge in *Haag*, erroneously focused on retribution over rehabilitation. We agree.

At Haag's resentencing, two experts testified that he would have been at a low risk of reoffending at the time of his offense, and he was then at a low risk of reoffending. *Haag*, 198 Wn.2d at 314. Haag presented evidence that he matured in prison, accumulated only one infraction in 1997, earned his high school diploma, worked throughout his incarceration, and became a Jehovah's Witness to try to help others. *Id.* His growth and maturity were reiterated by the prison chaplain and his expert evaluator.

*Id.* Haag testified to his sincere remorse for the crime. *Id.* at 314-15. The State offered victim impact testimony, but no expert opinions or other evidence to rebut Haag's position that he was unlikely to reoffend upon release. *Id.* at 315.

Haag's resentencing court explained that the severity of the punishment is calculated by the gravity of the wrong. *Id.* at 323. The court weighed Haag's "'vile, cowardly, and particularly heinous multi-step strangulation and drowning of a defenseless, sixty-five pound little girl'" against the mitigating factors, but specifically noted that "'rehabilitation is not the sole measure in sentencing.'" *Id.* The trial court commented, "'according to case law Mr. Haag's youthfulness does reduce his culpability'" but continuously focused on the youth of Haag's victim. *Id.* at 324. Despite acknowledging that the State brought no evidence rebutting the testimony that Haag was "'a good candidate for rehabilitation,'" the judge "improperly placed *more* emphasis on retribution than on mitigation." *Id.* at 325, 323. "The court's focus was clearly backward looking, disregarding the forward-looking focus required by our statutes and our case law." *Id.* at 323. This inversion of the balance between retributive and mitigating factors constituted a misapplication of law amounting to reversible error. *Id.* at 325.

Here, although the resentencing court's reasoning was not as "retribution focused" as in *Haag*, it was more backward looking than our precedent requires. Dr. Roesch

27

testified at length that Mr. Boot's behaviors as a teenager demonstrated impulsivity and immaturity. That Mr. Boot succumbed to the gang lifestyle and engaged in risk taking showed his vulnerability to negative peer pressure, lack of impulse control, and inability to think about the consequences of his actions. Dr. Roesch opined that Mr. Boot was *not* a mature 17 year old. He testified that Mr. Boot is not irreparably corrupt and has instead demonstrated his ability to change and grow, improving the likelihood of a positive transition to life after prison.

Mr. Boot's resentencing court almost entirely ignored Dr. Roesch's testimony and report. Indeed, it repeatedly mentioned that Mr. Boot was nearly 18 years old and was therefore "essentially an adult." CP at 176 (Finding of Fact (FF) 9). The court found no "impetuousness, emotion or impulsiveness, either by chronological age or by the evidence presented" and made no finding of immaturity. CP at 176 (FF 10, 13). Despite Dr. Roesch's opinion, the court found the evidence did not support negative influences by family or peers. And the court took Dr. Roesch's explanation that the age of 18 is an arbitrary line out of context when it found Mr. Boot's "mental and emotional development was no different than a like person or someone who had turned eighteen." CP at 175 (FF 4). Out of 16 findings of fact, only one discussed rehabilitation.

28

Like in *Haag*, the State presented no evidence rebutting Dr. Roesch's opinion that

Mr. Boot showed signs of rehabilitation and, with more services available, could

positively transition to life outside of prison. Yet, the court found it was "unknown"

whether Mr. Boot could safely return to society based on Mr. Wilson's belief that Mr.

Boot may not have "actual remorse" because he did not cry during the telephone

interview. CP at 176 (FF 15). The court did not mention or acknowledge Mr. Boot's

allocution, where he expressed remorse, took responsibility, admitted there was no excuse

for his actions, and explained that he works daily to change his environment and help

others. Like in *Haag*, there is not a sufficient quantity of evidence supporting a finding

that Mr. Boot was not, or could not be, rehabilitated. 198 Wn.2d at 325. A trial court

abuses its discretion by entering a finding of fact that lacks substantial evidence. *Id.*

We agree with Mr. Boot that the resentencing court favored retribution over the

substantial and uncontroverted evidence of rehabilitation. Under *Haag*, the inversion of

the balance between retributive and mitigating factors is a misapplication of the law

constituting reversible error. This is an alternative and equally compelling ground for

resentencing. We conclude that Mr. Boot is entitled to resentencing under both *Haag*

holdings. Our conclusion renders Mr. Boot's consolidated PRP moot.

B.     MANDATORY 25-YEAR MINIMUM

Mr. Boot argues the resentencing court erred in presuming the 25-year minimum

term in RCW 10.95.030(3)(a)(ii) was mandatory.  Although most of the parties'

arguments on this issue no longer warrant consideration due to intervening case law, we

briefly address it to guide the resentencing court on remand.

At Mr. Boot's 2017 resentencing hearing, the parties and court agreed that the 25-

year minimum term under RCW 10.95.030(3)(a)(ii) applied.  The record is unclear as to

whether the court knew it could depart from the statutory minimum.  However, Mr. Boot

did not argue for an exceptional sentence downward; he requested a term of 25 years.  To

the extent the resentencing court believed it lacked discretion to consider an exceptional

downward sentence (had Mr. Boot requested one), that belief was incorrect.  *See State v.*

*Gilbert*, 193 Wn.2d 169, 175, 438 P.3d 133 (2019) ("[S]entencing courts must account for

the mitigating qualities of youth and have absolute discretion to consider an exceptional

downward sentence in light of such mitigating factors . . . regardless of any sentencing

provision to the contrary.")[7] (citing *State v. Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d

409 (2017)).

---

[7] Because *Gilbert* conclusively establishes that the statutory minimum does not preclude a trial court from exercising its discretion to consider a downward departure, we decline to address Mr. Boot's challenge to the statute's constitutionality.

And, although it is not clear from the record that the court believed there was a presumption that 25 years was Mr. Boot's mandatory minimum sentence, to the extent that it did, that too is incorrect. *See Delbosque*, 195 Wn.2d at 123-24 (the factors and guidelines applicable to *Miller*-fix resentencing do not establish presumptions or place the burden of proof on either party).

Finally, with the benefit of hindsight, it appears the trial court may have placed undo weight on the fact that Mr. Boot was two weeks shy of his 18th birthday when he committed the offense. In *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021), the court held when a criminal defendant is convicted of aggravated first degree murder committed at the age of 18, 19, or 20, Washington Constitution article I, section 14 requires the resentencing court to conduct an individualized inquiry to determine whether the mitigating qualities of youth justify a downward departure from the sentence of life imprisonment without the possibility of parole. *Id.* at 329.

C.     REASSIGNMENT TO A NEW JUDGE

Mr. Boot requests this court to remand for resentencing with a different judge. We decline to do so.

The *Miller*-fix statute directs resentencing to occur with the offender's original sentencing court or its successor. *Delbosque*, 195 Wn.2d at 112 (quoting

RCW 10.95.035(1)). In 1996, Mr. Boot was sentenced in Spokane County Superior Court by Judge Eitzen. In 2017, he was resentenced in Spokane County Superior Court by Judge Clary, Judge Eitzen's successor. Mr. Boot argues that reassignment is appropriate here because Judge Clary's exercise of discretion in resentencing triggered this appeal. We disagree.

A criminal defendant has the right to be sentenced by an impartial court. U.S. CONST. amends. VI, XIV § 1; WASH. CONST. art. I, § 22. Under the appearance of fairness doctrine, it is not enough that the judge is impartial; the judge must also appear to be impartial. *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). We generally require a party seeking a new judge to file a motion for recusal in the trial court. *State v. McEnroe*, 181 Wn.2d 375, 386, 333 P.3d 402 (2014). This permits the development of an adequate record and allows the challenged judge to evaluate the stated grounds for recusal in the first instance. *Id.*

A party may, however, seek reassignment for the first time on appeal "where the issue raised on appeal is also the basis for the reassignment request." *Id.* at 387. This court orders reassignment in limited circumstances, such as when, on remand, the trial judge will exercise discretion as to the very issue that triggered the appeal and has expressed an opinion on the merits or has otherwise prejudged the issue. *Solis-Diaz*, 187

32

Wn.2d at 540. Yet "even where a trial judge has expressed a strong opinion as to the

matter appealed, reassignment is generally *not* available as an appellate remedy if the

appellate court's decision effectively limits the trial court's discretion on remand."

*McEnroe*, 181 Wn.2d at 387.

Mr. Boot argues Judge Clary knew he could not impose a life sentence so he

imposed the maximum constitutional term, which has now been deemed unconstitutional.

He implies that on remand, Judge Clary would again impose the maximum allowable

sentence and analogizes his case to *State v. Bassett*, No. 53721-4-II, slip op. (Wash. Ct.

App. Oct. 19, 2021) (unpublished), https://www.courts.wa.gov/opinions/

pdf/D2%2053721-4-II%20Unpublished%20Opinion.pdf (*Bassett* III).[8]

In *Bassett*, a juvenile offender was resentenced pursuant to the *Miller*-fix statutes

in 2015. *Bassett* I, 198 Wn. App. at 716. In Bassett's first resentencing, the judge

"rejected most of the mitigation evidence and imposed three consecutive life without

parole sentences." *Bassett* II, 192 Wn.2d at 75. The judge commented that Bassett would

never be rehabilitated such that he could be released safely. *Bassett* I, 198 Wn. App. at

721. Bassett appealed, and Division Two of this court reversed, holding the *Miller*-fix

---

[8] An unpublished opinion has no precedential value and is not binding but may be accorded such persuasive value as this court deems appropriate. GR 14.1.

statutory provision permitting life without parole for juvenile offenders violates the

Washington Constitution. *Id.* at 722-23. The Supreme Court affirmed and instructed that

the trial court, on remand, "may not impose a minimum term of life as it would result in a

life without parole sentence." *Bassett* II, 192 Wn.2d at 91.

Prior to Bassett's second resentencing before the same judge, he submitted a

lengthy report documenting evidence on the likelihood of success upon release and

presented extensive expert testimony regarding his immaturity at the time of his crime and

his subsequent rehabilitation. *Bassett* III, slip op. at 3-4. Still, the judge found the

evidence of Bassett's crimes outweighed any mitigating evidence and imposed a

collective term of 60 years' incarceration. *Id.* at 4. Bassett appealed his second

resentencing. *Id.*

In *Bassett* III, we held that Bassett's 60-year sentence constituted an

unconstitutional de facto life sentence under *Haag*. *Id.* at 4-5. We granted Bassett's

request for a different judge on remand, noting that at the first resentencing, the court

imposed three life sentences even though it had authority to impose as few as 25 years.

*Id.* at 7. On second remand, the same judge—now unable to impose a life sentence due to

Supreme Court precedent—imposed a 60-year term, "the functional equivalent of a life

sentence." *Id.* We reasoned, "Under these circumstances, it is reasonable for an objective

observer to conclude that the trial judge has prejudged the issue and at the third resentencing would look to impose the maximum constitutional sentence rather than fairly considering the factors required under the *Miller*-fix statute." *Id.*

We distinguish *Bassett* III. The first resentencing court stated it did not believe Bassett could ever be rehabilitated and imposed the same incredible sentence imposed in 1996 before the *Miller*-fix statutes went into effect—three lifetimes. Conversely, Judge Clary imposed a term of 50 years as opposed to Mr. Boot's original sentence of life without parole. Although Judge Clary explained that he "fel[t] constrained" by *Bassett* I, he did not express a personal opinion on Mr. Boot's rehabilitative potential or lack thereof. RP at 189.

Furthermore, after Bassett's first resentencing was deemed unconstitutional, the resentencing judge imposed a term of 60 years—which was again deemed unconstitutional. Here, Judge Clary has presided over one resentencing where he imposed a term of 10 less years than Bassett's second resentencing judge imposed. Unlike in *Bassett* III where we could reasonably presume that the same judge would again impose the maximum allowable sentence a third time, the record here does not support such a presumption. Although Judge Clary abused his discretion in failing to weigh rehabilitation over retribution, he did so under the false belief of what the jury had found

35

and without the benefit of several recent juvenile sentencing opinions. This area of law continues to change rapidly and we are confident that Judge Clary will properly exercise his discretion in light of the true facts, established precedent, and this opinion.

The State cites and distinguishes *Solis-Diaz*, 187 Wn.2d 535, to support its position that we need not order reassignment on remand. We agree that this case supports our decision.

Solis-Diaz was tried as an adult for crimes he committed when he was 16 years old. *Id.* at 537. Judge Nelson Hunt imposed a standard range sentence of 1,111 months' imprisonment, which Solis-Diaz challenged in a PRP based on ineffective assistance of counsel. *Id.* We remanded for resentencing and Judge Hunt imposed the same sentence. *Id.* He expressed disagreement with our holding on ineffective assistance and found our decision "insulting" as to his knowledge of the law and understanding of the case. *Id.* at 537-38. He opined the sentence he imposed was "'precisely what the Legislature intended,'" which was "severe sentencing for older teens who commit serious violent crimes . . . ." *Id.* at 538. He implied that the lengthy sentence had deterred gang-related firearms offenses in the area. *Id.* at 538-39.

Solis-Diaz appealed, and this court again remanded for resentencing due to Judge Hunt's failure to consider youthfulness. *Id.* at 539. We directed Judge Hunt "to conduct

a meaningful, individualized inquiry" into mitigating factors in light of recent case law, but we declined to disqualify Judge Hunt from presiding on remand. *Id.*

Solis-Diaz sought discretionary review of the disqualification issue. *Id.* Our Supreme Court reversed, noting that Judge Hunt's "frustration and unhappiness at the Court of Appeals requiring him to address anew whether Solis-Diaz should be considered for an exceptional downward sentence" along with his remarks at the first resentencing suggest "he is committed" to reimposing the original sentence. *Id.* at 541. This concern was heightened by the judge's apparent belief that the long sentence had a deterrent effect on gang-related gun activity in the area. *Id.* Finally, that Judge Hunt would exercise his discretion for the *third* time regarding a sentence he had *twice* imposed, combined with his comments on his prior sentence and strong opinions on juvenile sentencing, suggested he had already reached a conclusion in the matter. *Id.*

*Solis-Diaz*, like *Bassett* II, is distinguishable. Again, Mr. Boot has been resentenced one time. Judge Clary has not yet had an opportunity to disagree with our holding on Mr. Boot's resentencing, and we presume he will not do so. Unlike Judge Hunt, Judge Clary made no comments about the desirability of severely punishing older teens or any alleged deterrent effect of such a punishment. His comments reflect an

37

understanding that our decisions limit his discretion in resentencing. Based on the foregoing, we deny Mr. Boot's request for a different judge at resentencing.

Remand for resentencing consistent with this opinion. Our conclusion renders Mr. Boot's consolidated PRP moot.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Siddoway, C.J.                                    Pennell, J.